# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 18, 2021

Lyle W. Cayce
Clerk

No. 19-60896

Huawei Technologies USA, Incorporated; Huawei Technologies Company, Limited,

*Petitioners*,

*versus*

Federal Communications Commission; United States of America,

*Respondents*.

On Petition for Review of an Order of the
Federal Communications Commission, No. 19-121

Before Elrod, Duncan, and Wilson, *Circuit Judges*.
Stuart Kyle Duncan, *Circuit Judge*:

An FCC rule bars using government subsidies to buy equipment from companies designated security risks to communications networks. *See* Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, 85 Fed. Reg. 230-01 (Jan. 3, 2020). We consider a challenge to that rule by Huawei Technologies Company and its American affiliate, Huawei Technologies USA.

No. 19-60896

## Introduction

The federal government annually distributes billions of dollars to promote telephone and Internet service across our nation. These subsidies, called "universal service funds," are administered by the Federal Communications Commission ("FCC"). Last year, that agency issued a rule barring recipients from using the funds to buy equipment or services from companies designated "national security risks" to communications networks and supply chains. Under the rule, the FCC designated Huawei, a Chinese telecom provider, and its American affiliate as national security risks. The companies now level myriad challenges, both statutory and constitutional, to the rule and to their designation.

Their most troubling challenge is that the rule illegally arrogates to the FCC the power to make judgments about national security that lie outside the agency's authority and expertise. That claim gives us pause. The FCC deals with national communications, not foreign relations. It is not the Department of Defense, or the National Security Agency, or the President. If we were convinced that the FCC is here acting as "a sort of junior-varsity [State Department]," *Mistretta v. United States*, 488 U.S. 361, 427 (1989) (Scalia, J., dissenting), we would set the rule aside.

But no such skullduggery is afoot. Assessing security risks to telecom networks falls in the FCC's wheelhouse. And the agency's judgments about national security receive robust input from other expert agencies and officials. We are therefore persuaded that, in crafting the rule, the agency reasonably acted within the broad authority Congress gave it to regulate communications. Additionally, having carefully considered the companies' other challenges under the Administrative Procedure Act and the Constitution, we find those unavailing as well.

We therefore deny the petition for review.

No. 19-60896

## TABLE OF CONTENTS

Background ........................................................................... 4

Procedural History ............................................................. 11

Standard of Review ............................................................ 12

Discussion ........................................................................... 14

  I. Ripeness ........................................................................ 14

  II. Statutory Authority ................................................... 17

    A. Lack of Express Prohibition in Act ...................... 17

    B. *Chevron* Analysis ..................................................... 18

      1. "Public Interest" Provisions .............................. 19

      2. "Quality Services" Provision ............................. 25

    C. Additional Arguments ........................................... 30

      1. Lack of National Security Expertise ................ 30

      2. Conflict with Presidential Authority ................. 31

      3. Secure Networks Act ......................................... 32

  III. Substantive Challenges .......................................... 37

    A. Adequacy of Notice ............................................... 37

    B. Arbitrary and Capricious Review ......................... 41

      1. Consideration of Relevant Evidence and Arguments ...... 41

      2. Cost-Benefit Analysis ........................................ 46

      3. Rejection of Risk-Based Approach .................... 51

    C. Vagueness ................................................................ 54

    D. Due Process ............................................................ 58

  IV. Conclusion ............................................................... 61

No. 19-60896

## Background

Huawei Technologies Company ("Huawei") is a global provider of telecommunications equipment and services established and headquartered in China. It supplies smart device, cloud, and 5G broadband cellular technology to commercial entities and consumers. Huawei-USA launched in 2001 and maintains its U.S. headquarters in Plano, Texas.

As early as 2011, Huawei began attracting the U.S. government's attention as a potential security risk to American telecommunications networks.[1] In October 2012, the U.S. House Permanent Select Committee on Intelligence ("HPSCI") published a report finding, "Huawei . . . cannot be trusted to be free of foreign state influence and thus pose[s] a security threat to the United States and to our systems." *HPSCI Report*, at vi–vii. The HPSCI admonished U.S. government systems operators and contractors to exclude Huawei equipment and encouraged private entities to reconsider Huawei-associated security risks and "seek other vendors." *Id.* at vi.

In late 2017, members of Congress expressed apprehension about "Chinese espionage" and "Huawei's role in [it]" to then-Chairman of the FCC, Ajit Pai.[2] Pai's reply conveyed "share[d] . . . concerns about the security threat that Huawei and other Chinese technology companies pose to our communications networks."[3] He promised "to take proactive steps" to

---

[1] Mike Rogers & C.A. Dutch Ruppersberger, HPSCI, Investigative Report on the U.S. National Security Issues Posed by Chinese Telecommunications Companies Huawei and ZTE iv (2012), https://tinyurl.com/yyp5muou [hereinafter *HPSCI Report*].

[2] Letter from Tom Cotton et al., Members, U.S. Congr., to Ajit Pai, Chairman & Commiss'r, FCC (Dec. 20, 2017), https://tinyurl.com/yx6xp217.

[3] Letter from Ajit Pai, Chairman, FCC, to Tom Cotton, Sen., U.S. S. (Mar. 20, 2018), https://tinyurl.com/u2verd9.

No. 19-60896

"ensure the integrity of the communications supply chain . . . in the near future." *Id.*

Around this time, Congress passed, and the President signed into law, the National Defense Authorization Act for Fiscal Year 2018 ("2018 NDAA"), which barred the Defense Department from procuring telecommunications equipment produced by Huawei.[4] The 2019 NDAA went further, prohibiting all executive agencies from obtaining Huawei equipment, contracting with entities that use it, or using loan or grant funds to obtain it.[5] Sharing these concerns, then-President Donald Trump issued executive orders addressing the issue in 2019 and 2020.[6]

Against this backdrop, the FCC issued an April 2018 notice of proposed rulemaking ("NPRM"), "In the Matter of Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs."[7] The notice concerned "universal service funds" (or "USF funds"), a pool of money the FCC dispenses to certain providers to promote "universal service." *See* 47 U.S.C. § 254(e); *see also Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 617 (5th Cir. 2000).[8] USF funds foster affordable telephone and internet access in high-cost areas, subsidize rates

---

[4] *See* Pub. L. No. 115-91, § 1656(b)(1), (c)(3)(A), 131 Stat. 1283, 1762 (2017).

[5] *See* Pub. L. No. 115-232, § 889(a)–(b), (f)(3)(A), 132 Stat. 1636, 1917–18 (2018).

[6] Exec. Order No. 13,873, 84 Fed. Reg. 22,689 (May 15, 2019); Exec. Order No. 13913, 85 Fed. Reg. 19,643 (Apr. 4, 2020).

[7] Notice of Proposed Rulemaking in the Matter of Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs ("Supply Chain Rulemaking"), FCC 18-42, WC Docket No. 18-89, 33 FCC Rcd. 4058 (released Apr. 18, 2018).

[8] Universal service is defined as "an evolving level of telecommunications services that the Commission shall establish periodically . . . , taking into account advances in telecommunications and information technologies and services." § 254(c)(1).

No. 19-60896

for rural health care facilities, and support services for schools and libraries.[9] The NPRM sought comment on a proposed rule that would prohibit using USF funds "to purchase equipment or services from any communications equipment or service providers identified as posing a national security risk to communications networks or the communications supply chain." 33 FCC Rcd. at 4058. The NPRM also solicited comment on "how to identify companies" that pose such threats and proposed several approaches.[10] *Id.* at 4064. Comment was also sought on other steps the FCC could take, waivers for USF applicants, costs and benefits, and sources of legal authority for the rule. *Id.* at 4068–70. The NPRM drew extensive comments, including from Huawei.[11]

---

[9] *See* 47 U.S.C. § 254; *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 406, 407–08 (5th Cir. 1999) [hereinafter *TOPUC I*]. The USF fund's annual budget is about $8 billion. Universal Service Administrative Co., 2020 Annual Report 5 (2021), https://www.usac.org/wp-content/uploads/about/documents/annual-reports/2020/USAC_Annual_Report_2020.pdf. In 2020, about $800 million of those funds were allocated to the FCC's Lifeline Program, which "supports telecommunications companies that offer discounted phone and broadband services to eligible consumers," while just over $5 billion were allocated to the High Cost Program, which subsidizes the expansion of broadband networks in rural communities. *Id.* at 5, 12, 14.

[10] For instance, one suggested approach was to define a covered company as one "from which any agency of the Federal Government has been prohibited by Congress from procuring or obtaining any equipment, system, or service that uses telecommunications equipment or services provided by that company . . . ." 33 FCC Rcd. at 4064–65; *see also id.* at 4065–66 (suggesting other approaches).

[11] Some commenters argued the proposed prohibition went "too far" by including end-user devices like smartphones. Others commented the rule would "cause substantial harm" to small rural carriers without "corresponding benefits." Still others advocated the FCC employ "a more targeted approach" than a "blanket prohibition on the use of any equipment provided by a blacklisted vendor." Huawei argued the proposed rule would exceed the Commission's statutory authority, would be arbitrary and capricious under the APA, and would violate covered companies' due process rights.

No. 19-60896

Ultimately, the FCC released a final rule (the "USF Rule") barring use of USF funds to buy equipment or services provided by a company "posing a national security threat to the integrity of communications networks or the communications supply chain." 47 C.F.R. § 54.9(a). The USF Rule also adopted a process for designating covered companies that involves an initial designation by the Public Safety and Homeland Security Bureau ("Bureau"), a comment period, and a final designation. *Id.* § 54.9(b).[12]

In the cases of Huawei and ZTE Corporation, another Chinese telecommunications company, the FCC found the rulemaking record, as well as additional classified information, sufficient to initially designate both companies.[13] Thus, in the Report and Order ("USF Order") accompanying the USF Rule, the Commission announced Huawei's and ZTE's initial designations and directed the Bureau to "implement the next [designation] steps." 34 FCC Rcd. at 11440, 11449. The FCC also used the USF Order to explain its legal authority to adopt the rule, describe the designation standard, justify the rule's scope, provide a cost-benefit analysis, and otherwise respond to commenters.

---

[12] The Bureau is "the FCC's primary expert on public safety and homeland security matters." *Public Safety and Homeland Security*, FCC, https://www.fcc.gov/public-safety-and-homeland-security (last visited June 17, 2021). When the Bureau determines a company poses "a national security threat," it issues a notice of initial designation. § 54.9(b)(1). Interested parties may file comments opposing or otherwise responding to the initial designation. § 54.9(b)(2). If opposed, a final designation takes effect only upon the Bureau's determination the company should be designated. *Id.* The Bureau may reverse a final designation if it finds the entity no longer poses a threat. § 54.9(b)(3). The Bureau may also revise the designation process or adopt a new one. *Id.* § 54.9(b)(4).

[13] Report & Order in Supply Chain Rulemaking, FCC 19-121, WC Docket No. 18-89 & PS Docket Nos. 19-351, 19-352, 34 FCC Rcd. 11423, 11439–40 & n.124 (released Nov. 26, 2019).

No. 19-60896

First, as to its legal authority, the FCC explained that 47 U.S.C. § 254(e) permits it "to specify what a USF recipient may or must do with [universal service] funds."[14] *Id.* at 11434 (citation omitted). The FCC drew additional authority from various provisions in Title 47 empowering the agency to use USF funds to promote the public's interest in quality services and network security. *Id.* at 11434–37.[15]

The FCC also stated it would consider "all available evidence to determine whether an entity poses a national security threat." *Id.* at 11438. Such evidence might include findings by the Commission, Congress, the President, or other executive agencies that an entity "poses a national security threat" or "other available evidence, . . . open source or classified," supporting such an assessment. *Ibid.* The FCC said it would "seek to harmonize its determinations" with those of other Executive Branch agencies and Congress "[w]here appropriate." *Id.* at 11438–39.

Addressing the rule's scope, the FCC explained the rule applies to "any and all equipment or services, including software, produced or provided by a covered company." *Id.* at 11449. This "blanket prohibition" would

---

[14] Specifically, section 254(e) provides that a carrier that receives USF funds "shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e).

[15] *See id.* § 254(b)(1) (directing FCC to base universal service policies on six principles including promoting "[q]uality services . . . at just, reasonable, and affordable rates"); *id.* § 201(b) (Commission "may prescribe such rules and regulations as may be necessary in the public interest to carry out" the Communications Act); *id.* § 254(c)(1)(A), (D) (FCC and Joint Board must "consider the extent to which such telecommunications services" are "essential to . . . public safety" and "consistent with the public interest, convenience, and necessity"). The agency also cited § 105 of the Communications Assistance for Law Enforcement Act ("CALEA"), 47 U.S.C. § 1004, which permits carriers to authorize "interception of communications or access to call-identifying information effected within its switching premises" pursuant to "a court order or other lawful authorization." We discuss these provisions in greater detail, *infra*.

No. 19-60896

"best promote[] national security, provide[] the most administrable rule, and ease[] compliance for USF recipients." *Ibid.* While admitting a broad rule would "impose attendant costs on providers" and rural consumers, the Commission estimated the rule's benefits, though hard to quantify,[16] would "significantly and substantially outweigh" its costs. *Id.* at 11449–53, 11466.[17] Finally, the Commission discussed and rejected various constitutional considerations raised during the comment period, some of which Huawei advances here. *Id.* at 11457–65.[18]

On January 3, 2020, the FCC published a summary of the USF Order in the Federal Register that provided for a thirty-day comment period on the

---

[16] The agency assumed the rule would prevent economic harm by thwarting attacks on national communications networks. 34 FCC Rcd. at 11465. Given a national GDP of $20.5 trillion in 2018 (and a growth rate of 2.9%), the agency estimated that preventing even a 0.005% disruption to the economy or a 0.162% disruption to annual growth would outweigh estimated costs. *Ibid.* Similarly, given the digital economy's $1.35 trillion size, benefits would outweigh costs if the rule foiled a disruption of 0.072% of the digital economy. *Id.* These benefits were realistic, the FCC suggested, because malicious cyberactivity cost somewhere between $57 and $109 billion in 2016. *Ibid.* The FCC projected similar benefits from reducing identity theft. *Id.* at 11465–66. Moreover, the rule would produce additional benefits even harder to quantify, such as preventing threats to the national defense, public safety, homeland security, military readiness, and critical infrastructure. *Id.* at 11466.

[17] Costs would "not exceed $960 million" and were "likely to be much lower." 34 FCC Rcd. at 11465. The agency took the average cost of replacing Huawei/ZTE equipment (pegged at $40–$45 million based on estimates from seven carriers), multiplied by the number of firms using the equipment that "rely on universal service support," but reduced to account for carriers' decisions to use other funding to purchase or maintain the equipment. *Id.* at 11466–67. Based on a cost-stream estimate over twenty years and product price differential estimates of 10% and 25%, the FCC then estimated the lower and upper cost bounds as $160 million and $960 million, respectively. *Id.* at 11468–69. We consider the agency's cost-benefit analysis in greater detail *infra*.

[18] In brief, the FCC rejected arguments that the USF Rule and its applications would violate the Fifth Amendment's Due Process Clause, amount to an unconstitutional bill of attainder, and constitute a regulatory taking. 34 FCC Rcd. at 11457–65.

initial designations of Huawei and ZTE.[19] Huawei submitted comments arguing the Bureau should reject its initial designation.[20] On June 30, 2020, the Bureau issued a "final designation" of Huawei as a company covered by the USF Rule, which was "effective immediately upon release."[21] Huawei appealed the Bureau's determination to the full Commission a month later. On December 11, 2020, the FCC affirmed Huawei's final designation.[22]

Shortly after the USF Rule was published, Congress enacted related legislation, the Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2020) (codified at 47 U.S.C. § 1601 *et seq.*) [hereinafter "Secure Networks Act" or "SNA"]. Among other things, the SNA directs the Commission to publish a list of "covered communications equipment or services"—specifically, those posing national security risks as determined by "any executive branch interagency body with appropriate national security expertise," the Department of Commerce pursuant to Executive Order No. 13873, the 2019 NDAA, and/or "an appropriate national security agency." § 1601(a), (c). The SNA bars using Commission-administered subsidies to obtain or maintain any covered equipment or service. § 1602(a).

---

[19] Final Rule in Supply Chain Rulemaking; Huawei Designation; ZTE Designation, 85 Fed. Reg. 230-01 (Jan. 3, 2020) (to be codified at 47 C.F.R. pt. 54).

[20] Comments of Huawei Technologies Co., Ltd., and Huawei Technologies USA, Inc. on Supply Chain Rulemaking — Huawei Designation, PS Docket No. 19-351 (Feb. 3, 2020).

[21] Designation Order in Supply Chain Rulemaking — Huawei Designation, PS Docket No. 19-351, 35 FCC Rcd. 6604, 2020 WL 3566005, at *23 (released June 30, 2020) [hereinafter *Final Designation Order*].

[22] FCC Memorandum Opinion and Order in Supply Chain Rulemaking — Huawei Designation, FCC 20-179, PS Docket No. 19-351, 2020 WL 7351129 (released Dec. 11, 2020) [hereinafter *Designation Affirmance*].

No. 19-60896

A few weeks after Huawei's final designation, the FCC released a declaratory ruling "integrat[ing] provisions of the . . . [SNA] into [the Commission's] existing supply chain rulemaking proceeding."[23] The Declaratory Ruling found the USF Order fulfilled the FCC's duty under SNA § 3 to prohibit using Commission-administered subsidies to obtain covered equipment or services. *Id.* About six months later, on the same day it affirmed Huawei's final designation, the FCC released a second report and order further integrating the SNA's requirements into the supply chain rulemaking that began with the USF Order.[24] Congress later amended the SNA via the Consolidated Appropriations Act of 2021 to incorporate the USF Rule's definition of covered equipment and services for the purpose of reimbursing providers for replacing covered equipment or services.[25]

## Procedural History

This case comes before us on Huawei's petitions for review of the USF Order. *See* 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1); *see also* Fed. R. App. P. 15(a); *Alenco*, 201 F.3d at 614.[26] Huawei seeks review on the grounds that the Order (1) exceeded the FCC's statutory authority; (2) was arbitrary, capricious, and an abuse of discretion under the APA; (3) was adopted in

---

[23] Declaratory Ruling and Second Further Notice of Proposed Rulemaking in Supply Chain Rulemaking, FCC 20-99, WC Docket No. 18-89, 2020 WL 4046643, at *1 (released July 17, 2020).

[24] Second Report and Order in Supply Chain Rulemaking, FCC 20-176, WC Docket No. 18-89, 2020 WL 7351126 (released Dec. 11, 2020).

[25] Pub. L. No. 116-260, 134 Stat. 1182, 2120 (Dec. 27, 2020) (to be codified at 47 U.S.C. § 1603).

[26] Both of Huawei's petitions state they seek review of the entire document released on November 26, 2019, which included a Further Notice of Proposed Rulemaking and an Information Collection Order. But Huawei's subsequent briefing addresses only the Report and Order (which we refer to collectively as the "USF Order").

violation of the notice-and-comment requirements of 5 U.S.C. § 553; (4) was void for vagueness and retroactive in violation of the Constitution and the APA; (5) violated the Constitution's Appointments Clause and statutory and constitutional due process protections; and (6) was otherwise contrary to law. The parties' briefing and oral arguments clarified that Huawei's appeal presents independent challenges to two parts of the USF Order: the USF Rule and Huawei's initial designation.

As noted, the FCC affirmed Huawei's final designation after oral argument in this case. *Designation Affirmance*, 2020 WL 7351129. Huawei timely petitioned for review of the final designation order. We granted a stay in that case pending disposition of this one.

## STANDARD OF REVIEW

"The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communication Commission made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342. We review such orders in two ways. *See Alenco*, 201 F.3d at 614, 619.

First, we consider whether the agency's action exceeded its statutory authority under the *Chevron* framework. *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 730 (5th Cir. 2018); *see also Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). At step one, we ask whether "Congress has directly spoken to the precise question at issue," in which case we must "give effect to the unambiguously expressed intent of Congress" and reverse an agency's interpretation that fails to conform to the statutory text. *Alenco*, 201 F.3d at 619 (quoting *Chevron*, 467 U.S. at 842–43); *see also Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1024 (5th Cir. 2019) ("The question for the court [at step one] is whether the agency's construction of the language is within the range of meanings that could be plausibly attributed

to the relevant statutory language." (quoting 1 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 3.6, at 215 (5th ed. 2010))). We rely on "authoritative Supreme Court decisions" and "conventional standards of statutory interpretation," looking to "text, structure, and the overall statutory scheme." *Chamber of Com. v. U.S. Dep't of Lab.*, 885 F.3d 360, 369 (5th Cir. 2018).

If the statute is silent or ambiguous as to the specific issue, we proceed to step two and ask whether "the agency's answer is based on a permissible construction of the statute." *Alenco*, 201 F.3d at 619 (quoting *Chevron*, 467 U.S. at 843). If the agency's construction is "arbitrary, capricious, or manifestly contrary to the statute," we reverse. *Id.* (quoting *Chevron*, 467 U.S. at 844). But "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable," we defer to the agency's construction. *Acosta*, 909 F.3d at 730 (quoting *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 713 F.3d 488, 492 n.3 (5th Cir. 2013)).

Second, we will set aside agency action that is arbitrary and capricious, an abuse of discretion, or otherwise unlawful. 5 U.S.C. § 706(2)(A). Agencies "are required to engage in 'reasoned decisionmaking.'" *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)); *see also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan*, 576 U.S. at 750 (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). The agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Sierra Club*, 939 F.3d at 664 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

However, we cannot "substitute [our] judgment for that of the agency." *Id.* (quoting *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013)). Our role is to determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (quoting *State Farm*, 463 U.S. at 43).

We review constitutional issues *de novo. Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 419 n.34 (5th Cir. 1999) [hereinafter *TOPUC I*]; *see also* 5 U.S.C. § 706.

## Discussion

## I. Ripeness

The FCC contests the ripeness of Huawei's challenges to the USF Rule and to the initial designation.[27] The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–49. We apply a two-part test, balancing "the fitness of the issues for judicial decision" with "the hardship to the parties of withholding court consideration." *Id.* at 149; *see also Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007).

Here, the FCC originally argued that neither Huawei's challenges to the USF Rule nor its challenges to the initial designation were ripe because

---

[27] We assess ripeness claim by claim. *See John Corp. v. City of Houston*, 214 F.3d 573, 585–86 (5th Cir. 2000).

No. 19-60896

Huawei's asserted injuries—financial and reputational fallout from the "exclusion of its products from the federal USF program"—"w[ould] not materialize unless the Commission issue[d] a final designation of Huawei." In other words, the FCC never disputed the rule's fitness for review but only Huawei's showing of hardship. Now that Huawei has received a final designation and the full Commission has affirmed it, making the rule conclusively effective against Huawei, the FCC cannot assert its challenges to the USF Rule are unripe.[28]

By contrast, the initial designation is not ripe for review because it is not a final order and thus fails the fitness prong. *See Abbott Lab'ys*, 387 U.S. at 148–150 (considering finality of agency action in evaluating fitness); *Texas*, 497 F.3d at 498–99 (same). We have authority to review only "final orders" of the FCC under the Hobbs Act, 28 U.S.C. § 2342(1). A Hobbs Act "final order" is analytically identical to "final agency action" under the APA, 5 U.S.C. § 704. *See US West Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000); *Am. Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985). Agency action is "final" under § 704 if two conditions are met: (1) "the action must mark the consummation of the agency's

---

[28] "[Ripeness] is 'peculiarly a question of timing.'" *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 286 (5th Cir. 2012) (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)). Thus, we must evaluate it based on "the situation now rather than the situation" when the claims were first presented. *Reg'l Rail Reorganization*, 419 U.S. at 142–43; *see also DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 219–20 (5th Cir. 2021). Huawei presented undisputed declaration testimony of "huge financial losses" and workforce reductions resulting from the mere threat of designation. The FCC does not dispute that these injuries include permanent loss of business from USF recipients who would have used those funds to purchase Huawei equipment and the loss of future contracts with USF recipients, injuries sufficient to establish hardship. *See, e.g., Miss. Valley Gas Co. v. FERC*, 659 F.2d 488, 498–99 (5th Cir. 1981) (FERC order ripe where it would have a "direct and immediate impact" by denying petitioner right to charge rates at agreed amount).

decisionmaking process"; and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted) (citation omitted).

Fatally, Huawei fails to show the initial designation is the "consummation" of the FCC's decisional process. The rule describes the initial designation as the Bureau's "proposed" designation that triggers a comment period. 47 C.F.R. § 54.9(b)(1)–(2). An initial designation is, by definition, a tentative step: when opposed, it only takes effect once the Bureau decides to issue a final designation. *Id.* § 54.9(b)(2).[29] That is what happened here: opposed by Huawei, the company's initial designation took effect only upon the Bureau's issuing a final designation. *See Final Designation Order*, 2020 WL 3566005, at *1. Thus, Huawei's initial designation is not a final order, and we cannot review it. *See, e.g.*, *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014).

Huawei contends that the initial designation was not tentative or interlocutory because: the Commission, not the Bureau, initially designated Huawei; it did so based on determinative findings, expressed with confidence; it provided that the initial designation would become final absent objection; and it assumed in its cost-benefit analysis that Huawei would be finally designated. While these assertions suggest the initial designation is a

---

[29] *See La. Real Estate Appraisers Bd. v. FTC*, 976 F.3d 597, 605 n.7 (5th Cir. 2020) (agency order not final where party's injury contingent on future agency action); *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (EPA notice of violation not final action where it "mark[ed] only the beginning of a process designed to test the accuracy of the agency's initial conclusions" (quoting *Sierra Club v. EPA*, 557 F.3d 401, 408 (6th Cir. 2009))).

significant step, one supported by initial findings and analysis, they do not transform a proposed determination into a final one.

Thus, Huawei cannot satisfy the first prong of the finality test as to the initial designation, and its challenges to that part of the order are unfit for judicial review.[30] Accordingly, we must dismiss its claims related to the initial designation for lack of jurisdiction.

## II. STATUTORY AUTHORITY

We address Huawei's argument that the FCC lacked statutory authority to adopt the USF Rule.

### A. Lack of Express Prohibition in Act

As a threshold matter, the FCC claims we must defer to the agency's construction of § 254 unless the statute explicitly withholds authority to adopt the USF Rule. But our circuit has repeatedly rejected "[t]his nothing-equals-something" argument. *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460–62 (5th Cir. 2020); *see also Texas v. United States*, 809 F.3d 134, 186 (2015) [hereinafter *The DAPA Case*]. We do not jump to *Chevron* step two "any time a statute does not expressly *negate* the existence of a claimed administrative power." *The DAPA Case*, 809 F.3d at 186 (quoting *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995)). "[O]nly legislative *intent to delegate* such authority . . . entitles an agency to advance its own statutory construction for review" under *Chevron*'s "deferential second prong." *Gulf Fishermens*, 968 F.3d at 461 (quoting *Ethyl Corp.*, 51 F.3d at 1060).

---

[30] We need not consider the second finality prong because agency action must satisfy both prongs to be final. *See Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 756 (5th Cir. 2001). Nor need we consider whether Huawei can satisfy the burden prong of the ripeness test as to the initial designation. Unsuitability for review is determinative. *Id.*

No. 19-60896

Relatedly, the FCC argues, citing *TOPUC I* and *Alenco*, that "so long as the Commission does not violate an express statutory command, it may use the universal-service mechanism to achieve policy objectives contained elsewhere in the Act." The agency misreads these cases, which teach only that the FCC has "broad discretion" to balance the statutory goals of achieving universal service and promoting local competition. *Alenco*, 201 F.3d at 615; *TOPUC I*, 183 F.3d at 406.[31] Neither case supports the argument that the FCC may deploy the universal-service mechanism to accomplish any non-prohibited purpose in the Act.

## B. *Chevron* Analysis

We therefore proceed to *Chevron*. At step one, we ask whether Congress has "directly spoken to the precise question at issue." *Alenco*, 201 F.3d at 619 (quoting *Chevron*, 467 U.S. at 842). Here, we want to know whether Congress has plainly granted the authority the FCC wields in the rule—authority to designate companies a "national security threat" to telecom networks and to prohibit USF funds from being spent on their equipment. *See* 47 C.F.R. § 54.9. Huawei does not dispute that the FCC may restrict using USF funds for specific purposes; rather, it contests the FCC's power to "make national security determinations" in allocating those funds. The FCC responds that the Communications Act provisions it cites—47

---

[31] For example, in *TOPUC I*, we upheld under *Chevron* step two the agency's interpretation of the ambiguous term "sufficient" in § 254(e), based on its "reasonable determination" that support would remain sufficient "during the transition period from one [less competitive] universal service system to another [more competitive system]." 183 F.3d at 437. The FCC found "little chance" of competition eroding the previous support system during the transition. *Id.* at 436–37. In other words, we upheld the FCC's action because it concluded that promoting competition would not undermine its obligation to achieve sufficient service. Similarly, in *Alenco*, we stated that, although the FCC must promote both universal service and competition in local communications markets, it "cannot . . . sacrifice[ one] in favor of the other." 201 F.3d at 615.

U.S.C. §§ 201(b), 254(c)(1)(D), 254(b)(1), and 254(e)—are ambiguous on this point and that we must therefore proceed to *Chevron* step two.[32] By contrast, Huawei contends the USF Rule fails at *Chevron* step one because the cited provisions unambiguously withhold the FCC's claimed authority. We examine in turn each of the statutory provisions on which the FCC relies, first under *Chevron* step one and then under step two.

### 1. *"Public Interest" Provisions*

We turn first to 47 U.S.C. §§ 254(c)(1)(D) and 201(b), which we refer to together as the "public interest" provisions. Section 254(c)(1)(D) provides that the FCC, in "defin[ing]" services supported by universal service funds, "shall consider the extent to which such telecommunications services . . . are consistent with the public interest, convenience, and necessity." Section 201(b) similarly authorizes the Commission to "prescribe such rules and regulations as may be necessary in the public interest to carry out" the Act. The FCC argues these are capacious grants of authority, which—along with the "quality services" provision, *see infra*—reasonably encompass "considering foreign threats to the integrity of domestic communications networks in distributing federal subsidies."

As the Supreme Court has noted with respect to other sections of the Act, the term "public interest" gives the FCC authority that is "supple" and "comprehensive," but not "unlimited." *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940) (§ 319); *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216, 217 (1943) (§ 303).[33] The term is both broad and vague. *See FCC v.*

---

[32] The agency also argues the USF Rule "directly implements" § 105 of the CALEA, but as explained below we need not address this point.

[33] The "'public convenience, interest, or necessity'" was the touchstone for the exercise of the Commission's authority" under the 1934 Communications Act. *Pottsville Broad. Co.*, 309 U.S. at 137–38. For instance, in §§ 307 and 319 of the original Act, Congress

*WNCN Listeners Guild*, 450 U.S. 582, 593 (1981) (noting the Act does not define "public interest" in § 303). Consequently, while § 254(c)(1) plainly "authorizes the FCC to define 'periodically' the types of telecommunications services that are encompassed by 'universal service,'" *In re FCC 11-161*, 753 F.3d 1015, 1046 (10th Cir. 2014) (quoting § 254(c)(1)), "consistent with the public interest," § 254(c)(1)(D), how much latitude the agency has in defining the "public interest" is less clear.

Neither the term nor its context explicitly limits the FCC's authority to constrain USF funds based on a "national security" assessment. *See* 47 C.F.R. § 54.9(a); *cf. In re FCC 11-161*, 753 F.3d at 1046 (concluding "nothing in [§254(c)(1)] expressly or implicitly deprives the FCC of authority to direct that a USF recipient" use USF funding to provide broadband internet access services). Indeed, Congress's use of such an open-textured term suggests "an express delegation of authority to the agency to elucidate [the] . . . provision." *Chevron*, 467 U.S. at 843–44.[34] For purposes of *Chevron* step one, then, we would be hard-pressed to say these provisions unambiguously exclude the authority exercised in the USF Rule.

Huawei counters with several related points. It argues that § 201(b) is not an independent source of authority to regulate in the "public interest,"

---

authorized the Commission to grant station licenses and construction permits "if public convenience, interest, or necessity w[ould] be served thereby." Communications Act of 1934, Pub. L. No. 416, §§ 307(a), 319(a), 48 Stat. 1064, 1083, 1089 (codified as amended at 47 U.S.C. §§ 307, 319). The Act also provided that the FCC would exercise certain powers "as public convenience, interest, or necessity requires." § 303, 48 Stat. at 1082 (codified as amended at 47 U.S.C. § 303).

[34] *See also Anniston Broad. Co. v. FCC*, 668 F.2d 829, 832 (5th Cir. Unit B 1982) ("[T]he Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference."); Caleb Nelson, Statutory Interpretation 78 (2011) ("Vagueness often reflects a deliberate decision by [Congress] to transfer various important decisions to the courts or agencies . . . .").

No. 19-60896

and that § 254(c)(1)(D) "requires Joint Board participation, which did not occur here."[35] It also argues that § 254(c)(1)(D) uses "public interest" in reference to the "evolving level of telecommunications" service and so does not delegate to the FCC authority to make independent national security judgments. There is force in these arguments. We would be troubled if the FCC were trying to leverage its "public interest" authority over networks into the power to make freewheeling national security judgments. But we are persuaded that Huawei overstates the scope of the national security authority the FCC claims in the USF Rule.

The FCC does not ask us to read § 201(b) as a stand-alone font of regulatory authority. Instead, the agency reads it alongside its power in § 254(c)(1)(D) to "defin[e]" and "establish" universal service "consistent with the public interest," as well its duty in § 254(b)(1) to develop universal service policies in accord with certain principles, including promoting "quality services." Moreover, as we explain below, the agency has reasonably defined "quality services" to include services that are secure against foreign cyberattack. *See infra* pp. 25–29. Seen in that light, the FCC does not seek to grasp the expansive and independent national security authority Huawei fears. Instead, the FCC asserts only the authority to consider national security concerns in the narrower sphere of regulating USF "support mechanisms." *See* § 254(c)(1).[36]

---

[35] Congress created the Federal-State Joint Board, *inter alia*, to make recommendations to the FCC "regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations." 47 U.S.C. § 410; *see also* § 254(a); *TOPUC I*, 183 F.3d at 406.

[36] Huawei cites no authority for its argument that the FCC can exercise its § 254(c)(1)(D) authority only in coordination with the Joint Board. Section 254(c)(1)(D) states, "[t]he Joint Board in recommending, and the Commission in establishing, the definition of [universal service] services . . . shall consider" certain factors. It does not state the FCC may only define universal services upon a Joint Board recommendation. Indeed,

No. 19-60896

In sum, given the breadth of the term "public interest," we find neither § 201(b) nor § 254(c)(1)(D) unambiguously grants or withholds the FCC authority to adopt the USF Rule.

Turning to *Chevron* step two, we consider whether the FCC permissibly construed the public interest provisions. *Alenco*, 201 F.3d at 619 (citing *Chevron*, 467 U.S. at 843). The FCC has properly framed the inquiry: we ask whether it reasonably "construed its public interest obligation to encompass considering foreign threats to the integrity of domestic communications networks in distributing federal subsidies." We conclude it did and therefore defer under *Chevron*.

As noted, the Supreme Court has interpreted the public interest provisions of the Communications Act expansively. *See Pottsville Broad. Co.*, 309 U.S. at 138; *WNCN Listeners Guild*, 450 U.S. at 593; *Nat'l Broad. Co.*, 319 U.S. at 217–18. Section 201(b)'s similar provision was added just four years after §§ 303 and 319.[37] The FCC reasonably presumed the provisions should be interpreted consistently. *See* Antonin Scalia & Bryan A. Garner, Reading Law 170, 322–24 (2012) (discussing the presumption of consistent usage). Huawei does not argue otherwise.

---

the FCC is *required* to consult with the Board only under specified circumstances not present here. *See id.* § 410(c) (stating the Commission "*shall* refer any proceeding regarding the jurisdictional separation of common carrier property and expenses between interstate and intrastate operations" to the Joint Board) (emphasis added); *cf. TOPUC I*, 183 F.3d at 416–17 (finding agency fulfilled § 410(c)'s "consultation requirement" as to FCC's adoption of "new jurisdictional separations rules"). The FCC alone is entrusted with "establish[ing the definition of universal service] periodically" under § 254. *See id.* § 254(c)(1); *see also USF Order*, 34 FCC Rcd. at 11435 (making this argument).

[37] *Compare* § 201(b), 48 Stat. at 1070, *with* Communications Act of 1934, Amendment, Pub. L. No. 561, § 201(b), 52 Stat. 588, 588 (May 31, 1938) (codified at 47 U.S.C. § 201(b)) (adding "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act" to § 201(b)).

No. 19-60896

Additionally, § 254(c)(1)(D) appears to borrow from Communications Act provisions such as § 303, using similar phrasing. *Compare* § 254(c)(1)(D) ("consistent with the public interest, convenience, and necessity"), *with* § 303 (the FCC shall undertake its duties "as public convenience, interest, or necessity requires"). We presume Congress was aware of earlier glosses on "public interest," making reasonable a similarly broad reading of § 254(c)(1)(D). *See* SCALIA & GARNER, *supra*, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field . . . —it is reasonable to believe that the terminology bears a consistent meaning."); *see also Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (similar).

Huawei counters that public interest is "not a broad license to promote the general public welfare" but must "take meaning from the purposes of the regulatory legislation." *See NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976). In other words, the FCC cannot conjure national security authority out of thin air. This is true, but as the FCC argues, the Act's purposes include "mak[ing] [communication] available . . . for the purpose of the national defense" and "promoting safety of life and property through the use of wire and radio communications." § 151. The agency reasonably read "public interest" in light of these larger goals to encompass secure networks. *See NAACP,* 452 U.S. at 669; *cf.* SCALIA & GARNER, *supra*, at 218 ("[T]he prologue . . . can shed light on the meaning of the operative provisions that follow.").

Indeed, the FCC's considering national security under the public interest umbrella is not a new phenomenon.[38] *See, e.g.*, *Hawaiian Tel. Co. v.*

---

[38] *See* Joan M. McGivern, *U.S. Int'l Telecomm. & Inf. Policy: Congress Considers Reorganizing Policymaking*, 15 L. & POL'Y INT'L BUS. 1297, 1305 (1983) (noting the FCC's authority to regulate foreign commerce in communications and stating that,

No. 19-60896

*FCC*, 589 F.2d 647, 657 (D.C. Cir. 1978) (noting FCC review of "considerations of national security" under public interest standard in adopting satellite policy).[39] For example, in regulating foreign participation in the U.S. telecom market in the late 1990s, the FCC recommitted to considering "national security" and "foreign policy" concerns when granting licenses under § 310(b)(4) and service certificates under § 214(a), stating it would also continue to "accord deference" to expert Executive Branch views on these issues that would inform its "public interest analysis." In the Matter of Rules & Policies on Foreign Participation in the U.S. Telecomm. Mkt., 12 FCC Rcd. 23891, 23919–20 (1997).[40] The agency continues to consider national security concerns "in the public interest" in applying § 214(a) today. *See* In the Matter of China Mobile Int'l (USA) Inc.,

---

"[a]lthough the FCC is not specifically required to consider foreign policy, trade, and national security concerns, these concerns are deemed to be incorporated within its broad 'public interest' mandate" (citing Nat'l Telecomm. & Inf. Agency, Long Range Goals in Int'l Telecomm. & Inf.: An Outline for U.S. Pol'y, Printed for the Use of the Senate Comm. on Com., Sci. & Transp., 98th Cong., 1st Sess. 83 (1983) (Sen. Print 98-22)).

[39] *See also* U.S. Gen. Acct. Off., The FCC's Int'l Telecomm. Activities Rep. to the Chairman, Subcomm. on Gov't Info. & Individual Rts., House Comm. on Gov't Operations, at 10 (1982) (observing that the FCC had "consider[ed] foreign affairs, national security, and U.S. trade policy" in several recent proceedings, including in considering whether AT&T should award a contract to a Japanese firm); In the Matter of Amendment of Subpart H, Part 1 of the Commission's Rules and Regulations Concerning Ex Parte Communications and Presentations in Commission Proceedings, 2 FCC Rcd. 3011, 3018 (1987) ("recogniz[ing] . . . the Commission's need to confer with officials from other agencies on communications matters of international import, either because [the agency] share[d] jurisdiction with these other agencies or because consultation with them contribute[d] to the conduct of this country's foreign affairs policies and practices").

[40] *See also* In the Matter of Mkt. Entry & Regul. of Foreign-Affiliated Entities, 11 F.C.C. Rcd. 3873, 3888 (1995) ("We believe our public interest analysis [of foreign carrier applications] will benefit from . . . the Executive Branch['s input on foreign policy and national security].").

34 FCC Rcd. 3361, 3372, 3376–77, 2019 WL 2098511, at *7–11 (2019) (denying China Mobile § 214 authorization to provide telecom services due to "serious national security and law enforcement risks" identified by Executive Branch agencies).

Against this backdrop, the USF Rule accords with the FCC's previous consideration of national security concerns in the communications realm. Under the rule, the FCC makes initial and final designations based on "all available evidence," including determinations by Congress, the President, and other executive agencies, as well as classified information, and it "seek[s] to harmonize its determinations" with those of other agencies and Congress. 34 FCC Rcd. at 11438–39. Thus, as in granting licenses under § 310(b)(4) and service certificates under § 214(a), the FCC's designation of an entity as a national security risk consistent with the public interest is informed by the views of expert agencies. We therefore conclude that the agency reasonably interpreted the public interest provisions, especially in light of its coincident authority under § 254(b)(1), to allow it to adopt the rule. *See infra* p. 29.[41]

### 2. *"Quality Services" Provision*

We turn next to 47 U.S.C. § 254(b)(1), which we refer to as the "quality services" provision. It states that "[t]he Joint Board and the Commission shall base policies for the preservation and advancement of universal services on" various "principles," including that "*[q]uality services should be available at just, reasonable, and affordable rates.*" 47 U.S.C. § 254(b)(1) (emphasis added). The parties debate the meaning of "quality

---

[41] Although the USF Order also invoked § 254(c)(1)(A) in support of its statutory authority to adopt the rule, 34 FCC Rcd. at 11435, and Huawei addresses that argument in its brief, the FCC does not urge that argument on appeal, so we do not address it. We also find it unnecessary to address the FCC's arguments that § 254(e) or § 105 of the CALEA provide authority to adopt the rule.

services." As Huawei sees it, this is a telecom term of art that refers only to technical specifications such as a service's accuracy, reliability, and speed, thus excluding the USF Rule's concern for network security. The FCC counters that "quality services" is not a term of art but an ambiguous phrase that reasonably encompasses network security.

It is true, as Huawei points out, that "quality of service" is an industry term that refers to "performance specifications" like call clarity and bandwidth.[42] *See also* 47 U.S.C. § 641(12) (defining "quality of service," with respect to internet access, as "the download and upload speeds (and, for relevant services, latency) with respect to that service"). So, a telecom insider might say, "Quality of Service is more easy to define in digital circuits, since you can assign specific error conditions and compare them." NEWTON'S at 912. Had Congress used this industry term in § 254(b)(1), a court would correctly read it according to its specialized meaning.[43]

But Congress knows how to write "quality of service" in telecom statutes,[44] and it did not do so in § 254(b)(1). Instead, it chose a different

---

[42] *See, e.g.*, HARRY NEWTON, NEWTON'S TELECOM DICTIONARY 912 (25th ed. 2009) [hereinafter NEWTON'S] (explaining "quality of service" or "QoS" is "a measure of the telecommunications . . . quality provided to a subscriber" and includes factors such as call clarity, delay, bandwidth, and latency control); *Quality of Service*, Alliance for Telecommunications Industry Solutions Telecom Glossary, https://glossary.atis.org/glossary/quality-of-service-qos/ (last visited June 14, 2021) (QoS refers to "[t]he performance specification of a communications channel or system," or to "[a] subjective rating of telephone communications quality in which listeners judge transmissions by qualifiers, such as excellent, good, fair, poor, or unsatisfactory").

[43] *See, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 372 (1986) (explaining a term of art "should be interpreted by reference to the trade or industry to which [it] appl[ies]"); *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of act, it is proper to explain them by reference to the art or science to which they are appropriate." (cleaned up)).

[44] *See, e.g.*, 47 U.S.C. § 643 (making it unlawful to submit inaccurate data concerning "the *quality of service* with respect to broadband internet access service"); *id.*

term: "quality services." This makes us doubt that Congress intended the special meaning conveyed by the industry term.[45] Moreover, the context of § 254(b)(1) does not compel us to read "quality services" that way. To the contrary, it is awkward to read the provision to say that "[Certain performance specifications] should be available at just, reasonable, and affordable rates," which would follow from substituting "quality of service" for "quality services."

Congress instead chose a phrase, "quality services," whose ordinary meaning is broad. *See, e.g.*, *Quality*, adj., OXFORD ENGLISH DICTIONARY ("of high quality; excellent"); *see also Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407–08 (2011) (relying on the "ordinary meaning" of statutory terms). Recall also that the phrase appears not in a narrow, technical part of the Act, but in a section laying out broad "principles" guiding formulation of universal service policies.[46] This gives

---

§ 214 (requiring Commission certificates for construction or extension of new lines, but providing exceptions for certain alterations "which will not impair the adequacy or *quality of service* provided"); *id.* § 1442(e)(3)(D)(iii) (requirements for obtaining grant funds and spectrum capacity leasing rights include "that the State has . . . comparable security, coverage, and *quality of service* to that of the nationwide public safety broadband network" (emphases added)).

[45] *See* SCALIA & GARNER, *supra*, at 170 ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."); *cf. Gulf Fishermens Ass'n*, 968 F.3d at 466 ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up)).

[46] *See, e.g.*, *Deal v. United States*, 508 U.S. 129, 132 (noting "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used") (citations omitted); *see also* SCALIA & GARNER, *supra*, at 167 ("The text must be construed as a whole.").

No. 19-60896

us further reason to give the phrase a flexible reading, as opposed to a specialized, technical one.

We therefore disagree with Huawei that the "quality services" provision unambiguously excludes the authority exercised in the USF Rule, and so we proceed to *Chevron* step two. *See TOPUC I*, 183 F.3d at 412.

At step two, we consider whether the FCC's construction of § 254(b)(1) is "reasonable" or is instead "arbitrary, capricious, or manifestly contrary to the statute." *Acosta*, 909 F.3d at 730 (citations omitted). The agency has construed the term "quality services" to encompass network security, so that policymaking to promote "quality services" includes ensuring "USF funds [are] spent on secure networks and not . . . on equipment and services from companies that threaten national security." 34 FCC Rcd. at 11434. In other words, as the FCC puts it, "providing a secure service is part of providing a quality service." *Id.* We conclude this is a reasonable construction of the Act to which we therefore defer.

As the agency points out, the security of communications technology has been a perennial concern. Industry experts routinely listed security as one of "the most important dimensions of quality [for telecommunications]" in the years leading up to the enactment of § 254.[47] Thus, the FCC reasonably concluded that Congress intended the agency to promote the availability of

---

[47] *See, e.g.*, Vivian Witkind Davis et al., Telecommunications Service Quality iii, 19–23, 27 (1996) ; *see also* Eli M. Noam, *The Quality of Regulation in Regulating Quality: A Proposal for an Integrated Incentive Approach to Telephone Service Performance, in* Price Caps & Incentive Regulation in Telecommunications 168 (Michael Einhorn ed., 1991).

secure services when it directed the Commission to "base [universal service] policies" on the principle of advancing the availability of "*quality* services."[48]

This understanding accords with the FCC's previous conclusions that network security is a key component of quality service.[49] And we give the Commission considerable deference in applying § 254(b)'s "aspirational," generally-worded goals. *See TOPUC I*, 183 F.3d at 421; *see also id.* at 411 ("Rather than setting up specific conditions or requirements, § 254(b) reflects a Congressional intent to delegate these difficult policy choices to agency discretion[.]"). Thus, it was reasonable for the agency to conclude that advancing the availability of "quality services" under § 254(b)(1) comprehends promoting the availability of secure services.[50]

We therefore conclude the agency reasonably read the term "quality services" in § 254(b)(1) to support its limited exercise of national security judgment in defining universal service. Accordingly, we defer to the agency's construction under *Chevron* step two. *See, e.g.*, *TOPUC I*, 183 F.3d at 412.[51]

---

[48] *See* NELSON, *supra*, at 946 (noting "information about the policy preferences that prevailed at the time of enactment may well support reading the statute to establish" a directive consistent with that policy); *cf.* Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511, 515 ("Policy evaluation is . . . part of the traditional judicial tool-kit" at *Chevron* step one "*before* deferring to agency judgment . . . .").

[49] *See, e.g.*, 2015 Broadband Progress Report, 30 FCC Rcd. 1375, 1348 (2015) ("[P]rivacy and network security are among the factors that can affect the quality and reliability of broadband services."); Order in the Matter of Tech. Transitions, 29 FCC Rcd. 1433, 1441, 1448 (2014) (requiring participants in service-based experiments in transitioning to new technologies to "maintain[]" "[n]etwork security").

[50] *Cf. TOPUC II*, 265 F.3d 313, 322 (5th Cir. 2001) (declining to "arrogate to ourselves [the] policy-making function [under § 254(b)], merely because we (or the Petitioners) believe" the FCC should balance competing goals differently).

[51] Arguing against this construction of "quality services," Huawei points only to another provision, § 254(b)(3), which articulates the general principle that "low-income

No. 19-60896

## C. Additional Arguments

Huawei urges several additional reasons to doubt the FCC's authority to adopt the rule. We consider each in turn.

### 1. Lack of National Security Expertise

Huawei asserts we must reject the FCC's reading of the pertinent provisions because the FCC lacks the relevant national security expertise to support a presumption of congressional delegation. It contends Congress would not have delegated "such significant authority through modest, general terms like 'quality services,' let alone to an inexpert agency."

Once again, Huawei levels powerful arguments against a vision of the agency's authority that empowers it to make broad, independent national security judgments. Nonetheless, we are persuaded that the agency's authority under the USF Rule has a narrower scope. As the FCC argues, the rule requires the agency to make a more focused determination based on its "routine[] evaluat[ion of] evidence (including classified intelligence) [related to] foreign access to U.S. Communications networks" and its "participat[ion] in inter-agency working groups" on this topic.[52] That is, the

---

consumers and those in rural, insular, and high cost areas" should have access to "telecommunications and information services" that are "reasonably comparable" to those in "urban areas." But Huawei does not explain, and we do not see, how this access principle in § 254(b)(3) somehow excludes network security from "quality services" in § 254(b)(1).

[52] *See also* 47 U.S.C. § 310 (providing the Commission may refuse or revoke certain licenses in the "public interest" if a corporation is "directly or indirectly controlled" by a foreign government or a foreign corporation); *Information and Communications Technology (ICT) Supply Chain Risk Management (SCRM) Task Force*, Cybersec. & Infrastructure Sec. Agency, https://www.cisa.gov/ict-scrm-task-force (last visited Mar. 19, 2021) (listing the FCC as a participant in a task force of national security agencies and others to "identify[] and develop[] consensus strategies that enhance ICT supply chain security" against "foreign" cyberthreats); Exec. Order No. 13913, 85 Fed. Reg. 19643, at § 3(a)–(b)

No. 19-60896

FCC's judgments under the rule are informed by agencies with much more expertise than the FCC on these matters. *See* 47 C.F.R. § 54.9; *USF Order*, 34 FCC Rcd. at 11438. Thus, as the agency contends, the authority it exercises under the rule closely resembles the kind of national security authority it has exercised for decades—limited, communications-focused judgment informed by expert agencies and deferential to their views. *See supra* pp. 23–25.

### 2. Conflict with Presidential Authority

Huawei points to other provisions in the Communications Act that vest national security judgments "exclusively in the President." Specifically, it cites 47 U.S.C. §§ 305(c), 308(a), and 606(c)–(d). Drawing a negative inference from these provisions, Huawei argues the Act therefore did not delegate similar authority to the FCC. We disagree.

As the FCC argues, none of these provisions conflicts with Congress's intent to allow the FCC to exercise limited national security judgment in applying the USF Rule. For instance, § 305(c) empowers the President to authorize foreign governments to operate radio stations near their American embassies if he deems it consistent with "national security." This accords with the President's traditional role as the nation's "sole representative with foreign nations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (quoting John Marshall, Annals, 6th Cong., col. 613 (Mar. 7, 1800)). Similarly, § 606(c)–(d) addresses the President's authority to suspend communications rules during wars or other exigencies, reflecting the President's authority "in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). These provisions are not at odds with

---

(establishing committee of defense department heads "to assist the FCC in its public interest review of national security . . . concerns").

No. 19-60896

Congress's giving the FCC authority to make certain national security decisions concerning communications networks. After all, Congress created the FCC in part "for the purpose of the national defense," § 151, and assigned the Commission duties requiring it to exercise limited judgment related to that purpose. *See, e.g.*, § 310(b)(4) (empowering FCC to refuse or revoke the license of certain foreign corporations in the "public interest").[53]

### 3. Secure Networks Act

Finally, Huawei points to a statute enacted after the rule—the Secure Networks Act or SNA—which, it argues, confirms that Congress could not have intended to grant the FCC the authority asserted in the rule. *See supra* pp. 10–11 (discussing the SNA). We disagree.

Similar to the USF Rule, the SNA prohibits using FCC-administered subsidies for certain purposes based on an assessment of "unacceptable risk to . . . national security." 47 U.S.C. § 1601(b)(1). Unlike the rule, however, the SNA delegates responsibility for making that assessment "exclusively" to entities other than the FCC, relegating the FCC to a ministerial role. *Id.* §§ 1601(a), 1601(b)(1), 1601(c). Moreover, the SNA authorizes prohibitions

---

[53] For similar reasons, we disagree with Huawei that constitutional avoidance principles require us to reject the FCC's construction of its authority under the Act. Huawei contends that permitting an independent agency like the FCC to "make independent judgments about national security and foreign affairs" would unconstitutionally prevent the President from carrying out his role as the nation's "sole organ" in external relations and communication with foreign nations. We disagree that the FCC's exercise of authority in applying the rule risks the separation-of-powers problem that Huawei fears. As we have explained, in applying the USF Rule, the FCC does not purport to make an entirely "independent judgment[] about national security and foreign affairs." Rather, the rule permits the agency to consider the expert national security judgments of other Executive Branch agencies and Congress while exercising its own judgment "within the agency['s] core area[] of expertise." 47 C.F.R. § 54.9(a)–(b); *USF Order*, 34 FCC Rcd. at 11438.

only of particular equipment or services, not entire companies like the rule. § 1601(b). Thus, Huawei argues, the SNA speaks more specifically to the topic and in a way inconsistent with the rule. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (explaining a statute's meaning "may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand"). Based on those inconsistencies, Huawei contends we should infer from the SNA's enactment that the FCC's construction is unreasonable.[54]

The FCC correctly responds, however, that the USF Rule is not fatally opposed to the SNA. First, the "national security authority" exercised by the FCC in the rule is similar to the agency's role under the SNA. The SNA directs the FCC to list covered equipment or services based on determinations by (1) interagency bodies with national security expertise, (2) the Commerce Secretary pursuant to Executive Order 13,873, *see supra* note 6, (3) Congress in the 2019 NDAA, and (4) "an appropriate national security agency." § 1601(c)(1)–(4). Under the USF Rule, the FCC similarly designates companies based on "all available evidence," including the kinds of sources listed in the SNA.[55] As appropriate, the Commission "will [also] seek to harmonize its determinations" with those of other executive agencies and of Congress. 34 FCC Rcd. at 11438–39. Thus, while the FCC's judgment is more constrained under the SNA, its assessments under the USF Rule rest on the same kind of sources in the SNA. Contrary to Huawei's argument,

---

[54] The FCC contends Huawei waived its SNA argument by raising it for the first time in its reply brief. We need not decide this question because we find the argument unpersuasive regardless.

[55] *See* 47 C.F.R. § 54.9(a); *USF Order*, 34 FCC Rcd. at 11438 (providing the Commission may consider determinations by the FCC, Congress, the President, and other executive agencies, as well as classified information).

then, the SNA's allocation of authority to make national security judgments does not rule out the FCC's construction of its authority in the rule.

Second, the SNA's coverage only of equipment or services, rather than entire companies, reflects Congress's policy choice and does not fatally undermine the FCC's authority in the USF Rule. As noted, the FCC considered and rejected a rule of narrower scope based on its conclusion that a broad rule would "best promote[] national security, provide[] the most administrable rule, and ease[] compliance for USF recipients." *USF Order*, 34 FCC Rcd. at 11449–50. By contrast, Congress determined that the SNA's distinct objectives would be better achieved by a narrower prohibition covering only equipment or services. As the FCC argues, although the SNA includes a prohibition provision like the USF Rule, § 1602(a)(1), the SNA goes beyond the scope of the rule in various ways concerning equipment and services.[56] Congress's decision to orient these additional actions around an equipment-based prohibition does not suggest that the FCC lacked the authority under the Act to craft a different design for the rule.

Third, the *Brown & Williamson* principle Huawei invokes—that subsequent laws can affect a statute's meaning—looks to the entire body of relevant law. In addition to the SNA, that body of law now includes a statute showing Congress's approval of the FCC's assertion of authority in the rule. In the 2021 Consolidated Appropriations Act, Congress changed the SNA's definition of "covered communications equipment or services" for whose

---

[56] Specifically, the SNA (1) orders the Commission to a create a list of covered equipment and services that it would use in part to determine eligibility for reimbursement funds, (2) instructs the FCC to develop a list of suggested replacement equipment, (3) creates a fund to reimburse carriers who remove covered equipment, (4) directs carriers to report and justify their new purchases and continued use of covered equipment, and (5) provides enforcement mechanisms. §§ 1601(a), 1603(a)–(c), (d), 1604, 1606.

removal or replacement a USF recipient could be reimbursed.[57] While recipients under the original SNA could be reimbursed for removing equipment or services "on the initial list published under § 1601(a)," § 1603(c)(1)(A), recipients under the amended SNA can be reimbursed for removing equipment or services "as defined in" the USF Order or "as determined to be covered" by the USF Order and Huawei/ZTE designation orders, § 901(1)(B), 134 Stat. at 2120. In other words, Congress replaced the original definition based on the "exclusive[] . . . determinations" of certain expert agencies with a definition based on the challenged exercise of authority described in the USF Rule.

Huawei counters that these amendments are merely "definition-borrowing" provisions that "neither rel[y] on nor support[] [the USF Rule's] validity." It speculates "[t]he appropriations law's incorporation of the USF rule's definition likely reflects Congress' attempt to make whole small carriers who tried to replace all equipment in the wake of the USF rule." And it contends the specified amendments cannot satisfy the standard for ratification of the USF Rule, pointing to Congress's failure to amend the SNA's prohibition or non-revisitation provisions or to use express ratification language.

Huawei's rejoinder loses sight of the key question, which is whether the SNA "shape[s] or focus[es]" the meaning of the relevant Communications Act provisions, rendering the FCC's constructions unreasonable. In *Brown & Williamson*, the FDA's construction of its authority to regulate tobacco "plainly contradict[ed] congressional policy" as revealed in six distinct pieces of legislation over almost four decades. 529

---

[57] *See* Pub. L. No. 260, § 901(1)(B), 134 Stat. 1182, 2120 (2020); *see also* 47 U.S.C. § 1603(c)(1)(A)–(C).

No. 19-60896

U.S. at 126, 137–39, 143–44, 146. Here, by contrast, we have one statute that is not flatly inconsistent with the agency's assertion of authority, followed by a second statute amending the first statute to make it *more* consistent.[58]

In sum, contrary to Huawei's argument, the SNA does not show that the FCC's asserted authority in the USF Rule was unreasonable.[59]

\*\*\*

In sum, we conclude that the FCC reasonably interpreted its authority under the Communications Act in formulating the USF Rule. Specifically, we find the agency reasonably interpreted the Act's "public interest" provisions (§ 254(c)(1)(D), in coordination with § 201(b)), to authorize

---

[58] Because we disagree with Huawei's interpretation of the SNA, we do not address the argument it raises in a Rule 28(j) filing that the "SNA Rule," 86 Fed. Reg. 2904 (Jan. 13, 2021), confirms the USF Rule is inconsistent with the SNA. However, we note that the FCC concluded in its rule implementing the SNA that that rule and the USF Rule "are intended to complement each other," 86 Fed. Reg. at 2918–19, which is consistent with the interpretation of the SNA the FCC advances here.

[59] Huawei levels two additional challenges to the FCC's authority that need not long detain us. First, Huawei contends the FCC may make universal service policies only in accord with § 254(b)'s six enumerated principles, none of which involves national security. Our decision in *TOPUC I* forecloses this argument. *See* 183 F.3d at 412 (finding FCC could use the universal service mechanism to promote the unlisted goal of competition, provided it also advanced a § 254 command). Second, Huawei argues the rule "undermines" the § 254(b) principles by "denying USF recipients access to . . . cost-effective and high-quality equipment and services." This argument assumes the agency cannot balance conflicting aspects of quality, which is not so. The language "should" in § 254(b) "indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.'" *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001); *see also TOPUC I*, 183 F.3d at 421 (describing § 254(b)'s principles as containing "aspirational language" and not "constitut[ing] a series of specific statutory commands"); *Alenco*, 201 F.3d at 621 (describing "predictability" in § 254(b)(5) as "only a principle, not a statutory command"). Thus, the "FCC may exercise its discretion to balance [§ 254(b)'s] principles against one another when they conflict." *Qwest Corp.*, 258 F.3d at 1200; *Alenco*, 201 F.3d at 621 (holding "[t]o satisfy a countervailing statutory principle, therefore, the FCC may exercise reasoned discretion to ignore [§ 254(b)(5)'s principle]").

36

allocation of universal service funds based on the agency's exercise of limited national security judgment. We also hold that it reasonably interpreted the "quality services" provision in § 254(b)(1) to support that exercise. We therefore defer to the agency's interpretation under *Chevron* and reject Huawei's argument that the agency lacked statutory authority for the rule.

## III. Substantive Challenges

Huawei raises numerous challenges to the lawfulness and constitutionality of the USF Rule, which we treat as follows. Part A considers whether the NPRM provided adequate notice. Part B considers whether, as Huawei claims, the USF Rule was not the result of reasoned decisionmaking because the FCC (1) ignored relevant legal arguments and evidence; (2) engaged in a flawed cost-benefit analysis; and (3) failed to consider a more effective alternate approach for advancing national security. Part C examines Huawei's argument that the rule violates the APA because it is vague and standardless. Finally, Part D considers whether the rule must be vacated because it fails to provide adequate process before an initial designation.

### A. Adequacy of Notice

First, we consider Huawei's argument that the NPRM failed to give adequate notice of the designation process adopted in the USF Rule.

Under the APA, an agency must publish notice of the legal authority for a proposed rule and of the rule's substance or subject matter, 5 U.S.C. § 553(b)(2), (3), and must also provide an opportunity for interested persons to participate in the rulemaking, § 553(c). Notice suffices if it is a "logical outgrowth" of the proposed rule, meaning the notice must "adequately frame the subjects for discussion" such that "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (internal citations omitted). If a party "should have anticipated" that course, it "reasonably

should have filed [its] comments on the subject during the notice-and-comment period." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021) (citing *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 938-39 (D.C. Cir. 2006)).

Huawei identifies five aspects of the designation procedure that, it claims, appeared for the first time in the final rule without "any" notice. These are: (1) an initial designation process without pre-deprivation process; (2) a thirty-day response period for written comments, absent which the initial designation becomes final; (3) delegation to the Bureau of authority "to make both initial and final designations" and "to reverse prior designations"; (4) delegation to the Bureau of authority "to revise th[e] process"; and (5) independent FCC review before judicial review. Huawei argues these procedures were not a "logical outgrowth" of the notice because "[s]omething is not a logical outgrowth of nothing."

We agree that if the FCC had failed to provide *any* notice of these changes, the NPRM would have violated § 553. *See, e.g.*, *Kooritzky v. Reich*, 17 F.3d 1509, 1514 (D.C. Cir. 1994) (holding agency violated § 553 where proposed rulemaking "contain[ed] nothing, not the merest hint, to suggest" it would amend a regulation). But that is not what happened. As the FCC argues, the notice satisfied the requisite standard by "fairly appris[ing] interested persons of the subjects and issues the agency [was] considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989); *see also United Steelworkers of America v. Schuylkill Metals Corp.*, 828 F.2d 314, 317 (5th Cir. 1987) (identifying this as "[t]he proper test" and collecting cases). Specifically, the NPRM sought comment on the ultimate subject of § 54.9(b)—identifying companies posing a national security threat to networks—and apprised interested parties of the related issues under consideration by offering designation proposals and inviting alternatives. *NPRM*, 33 FCC Rcd. at 4064–66. This was "all the APA demands." *Chem.*

No. 19-60896

*Mfrs. Ass'n*, 870 F.2d at 203. The agency was not required to "specifically identify 'every precise proposal which [the agency] m[ight] ultimately adopt,'" and it permissibly implemented changes in the final rule "instigated by . . . comments" during the rulemaking. *Chem. Mfrs. Ass'n*, 870 F.2d at 203 (quoting *United Steelworkers of America*, 828 F.2d at 317).

Consequently, the NPRM should have enabled—and in fact, did enable—Huawei to anticipate those aspects of the final rule it claims were not properly noticed. *See Tex. Ass'n of Mfrs.*, 989 F.3d at 381–82. For example, by proposing to define a covered company as one already subject to agency or congressional prohibitions, *see NPRM*, 33 FCC Rcd. at 4064, the FCC signaled it was considering designating companies without pre-designation process. Indeed, Huawei objected that the absence of "notice" and "a meaningful individualized hearing" violated due process. The FCC also proposed allocating designation authority to itself, another federal agency (including one that "regularly deals with national security risks"), or the Universal Service Administrative Company ("USAC") under the FCC's supervision.[60] *NPRM*, 33 FCC Rcd. at 4065. In response, Huawei commented that the agency could not itself designate companies given its lack of expertise, that assigning the task to another agency "would constitute an unlawful subdelegation," and that if the agency subdelegated authority at all, it must be to "a subordinate." Thus, the initial notice and subsequent comments alerted Huawei to the issues it flags here—*e.g.*, whether pre-designation process should be provided, and whether (and to whom) the agency could delegate its designation authority.

---

[60] The Universal Service Administrative Company is an independent not-for-profit organization designated by the FCC that administers the universal service fund with FCC policy guidance. *About USAC*, Universal Serv. Admin. Co., https://www.usac.org/about/ (last visited Mar. 31, 2021).

No. 19-60896

Indeed, the new designation processes adopted by the USF Rule responded directly to Huawei's comments, confirming the rule is a "logical outgrowth" of the rulemaking. *See Chem. Mfrs. Ass'n*, 870 F.2d at 203 (final rule changes "were instigated by industry comments" and so grew out of comment process). The final rule adopts the kind of process Huawei commented was absent from the proposed rule. *See* 47 C.F.R. § 54.9(b)(1)–(2) (providing notice of initial designation and a thirty-day comment period); *see also supra* note 12. A company that opposes its initial designation is finally designated only after receiving, as Huawei advocated, opportunity to "review and respond to the evidence against it" and a "meaningful individualized hearing." *Id.* And the rule similarly responds to Huawei's comments about designation authority by delegating not to the Commission or another agency but to a subordinate entity that "regularly deals with [homeland] security risks," an expertise closely related to national security.[61] *NPRM*, 33 FCC Rcd. at 4065.

In sum, while the NPRM did not specify the precise procedures the agency ultimately adopted, the rulemaking fairly acquainted Huawei with the subject and issues delineated in § 54.9(b), which is all § 553 demands. *Chem. Mfrs. Ass'n*, 870 F.2d at 203; *see also Hodge v. Dalton*, 107 F.3d 705, 711–12 (9th Cir. 1997) (regulation adopted in reaction to comment adequately noticed where "in character with the original proposal" (citation omitted)).

---

[61] As noted, the Public Safety and Homeland Security Bureau is "the FCC's primary expert on public safety and homeland security matters." *Public Safety and Homeland Security*, FCC, https://www.fcc.gov/public-safety-and-homeland-security (last visited June 17, 2021); *see also Cybersecurity & Comm'ns Reliability Div., Public Safety and Homeland Security Bureau*, FCC, https://www.fcc.gov/cybersecurity-and-communications-reliability-division-public-safety-and-homeland-security-bureau (last visited June 17, 2021) (describing Bureau's work to "identify and reduce risks" to network reliability).

And the final rule's adoption of changes responsive to Huawei's comments underlines that the rule logically emerged from the rulemaking.

## B. Arbitrary and Capricious Review

Next, we turn to Huawei's arguments the FCC acted arbitrarily and capriciously in adopting the USF Rule. We consider in turn: (1) whether the agency ignored relevant evidence and legal arguments, (2) whether its cost-benefit analysis was irrational, and (3) whether it failed to explain its rejection of a narrower approach that would have more effectively advanced its stated objective. In each case, we find the agency "acted within a zone of reasonableness." *Prometheus Radio Project*, 141 S. Ct. at 1158.

### 1. Consideration of Relevant Evidence and Arguments

First, Huawei contends the FCC failed to consider relevant evidence and legal arguments. *See State Farm*, 463 U.S. at 43. Although the FCC could have done more, under our "narrow and highly deferential" standard of review, it did enough. *Sierra Club*, 939 F.3d at 672.

Arbitrary-and-capricious review requires that an agency "has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158; *see also Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (agency violates the arbitrary-and-capricious standard "if it fails to respond to 'significant points' and consider 'all relevant factors' raised by the public comments" (citation omitted)). Comments are "significant," and thus require response, only if they raise points "which, if true . . . and which, if adopted, would require a change in an agency's proposed rule." *City of Portland v. EPA*, 507 F.3d 706, 714–15 (D.C. Cir. 2007) (emphasis removed) (citation omitted).

Huawei identifies five categories of evidence-based comments it says the FCC "ignored or largely disregarded without explanation." First, it

41

argues the FCC failed to meaningfully consider economic reports that the rule would harm rural communities by eliminating a low-cost market competitor, as well as rural carrier declarations that Huawei's exclusion could produce ruinously higher costs. But as the FCC argues, it did respond to those arguments. The agency acknowledged evidence that the USF Rule could "widen the digital divide" and drive certain rural providers out of business, but it deemed those costs outweighed by the security risk to national networks associated with a partial ban.[62] The agency also suggested it viewed rural carrier costs as overstated, explaining that "[n]o provider ha[d] yet offered the detailed financial records" necessary to show an inability to "maintain its existing network without violating [the] rule." *USF Order*, 34 FCC Rcd. at 11453. Elsewhere, it noted that the carriers who provided cost estimates represented only 0.15% of mobile carrier end-user revenues and suggested they likely had stronger incentives to comment than similarly situated non-reporting carriers. *Id.* at 11467. Still, the agency developed a waiver process "to minimize the [rule's] economic burden . . . on small entities" facing exceptional financial straits. *Id.* at 11454 n.227, 11515. Thus, the FCC "clearly thought about the [commenters'] objections" and offered "reasoned replies—all the APA requires." *City of Portland*, 507 F.3d at 714.[63]

Huawei next contends the FCC ignored comments from rural carriers arguing the rule would reduce availability of affordable quality services. But again, as the FCC points out, it did address the rule's "potential impact" on

---

[62] *USF Order*, 34 FCC Rcd. at 11449–50 & n.206, 11453 (citations omitted); *see also id.* at 11434 (discussing covered companies' ability to out-compete more secure competitors due to foreign government subsidies).

[63] *See also PSSI Global Servs., L.L.C. v. FCC*, 983 F.3d 1, 12 (D.C. Cir. 2020) (rejecting argument FCC failed to "reasonably respond to [a] concern" where it "establish[ed] several significant protections against it").

No. 19-60896

this issue. It pointed to record evidence "demonstrat[ing] that [quality] service [could] be provided" at reasonable rates "without [covered] suppliers," and it theorized that the rule would "unleash competition" among higher quality suppliers that did not pose similar security risks. *USF Order*, 34 FCC Rcd. at 11434.[64] Huawei replies that the FCC's first response "ignores actual evidence about excluding Huawei" and that the second "does not explain why *eliminating* a competitor will 'unleash competition.'" We disagree. The FCC considered the costs Huawei identified, including arguments the rule would "drive up rates without a proportionate increase in quality," *id.* at 11434 & n.85 (citation omitted), but it concluded Huawei's low-cost equipment came with security—and thus quality—tradeoffs impossible to tolerate, *id.* at 11434. And with respect to competition, the Commission suggested that the presence of foreign-government-subsidized carriers distorted market costs and that eliminating them would promote competition among "*higher-quality* suppliers" for the USF subsidies. *Id.* (emphasis added).[65] In other words, as with rural carrier costs, the agency

---

[64] The FCC cited the Telecommunications Industry Association ("TIA")'s Reply Comments, 34 FCC Rcd. at 11434 & n.86, which contested the argument that "eliminating the availability of equipment from two problematic vendors" would violate § 254(b)(1)'s "broad principle" that quality equipment be available at affordable rates "when only a very small number of companies m[ight] be impacted," Telecomms. Indus. Ass'n, Reply Comments on Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, 78 (July 2, 2018) [hereinafter "TIA Reply Comments"]. Rather, it asserted, "hundreds of USF-companies have been able to provide quality services at reasonable and affordable rates using other suppliers." *Ibid.*; *see also* 2 PIERCE, *supra*, § 11.6, at 1047 (explaining that courts may consider the "whole record," which includes comments received in response to an NPRM (quoting 5 U.S.C. § 706(e))).

[65] The FCC cited TIA's Reply Comments, 34 FCC Rcd. at 11434 & n.87, which discussed the "preferential financial treatment" of Huawei and ZTE by the Chinese government, TIA Reply Comments at 62–65. Contrary to Huawei's and other commenters' arguments that Huawei's presence increased competition, TIA contended that Huawei's participation in the market created distortions that "'breed indiscipline and overcapacity'" and argued that, "[i]f anything, Huawei's presence in the market harms

weighed the evidence differently than Huawei and reached contrary but reasonable policy conclusions.

Next, Huawei asserts the FCC did not respond directly to arguments that a company-based approach would "ignore global supply-chain risks," *i.e.*, risks arising from *other* major suppliers operating in or purchasing materials from China. The FCC counters that it did answer those arguments by explaining that Huawei and ZTE pose a "unique" threat. We agree with Huawei that this response is off-point. Pointing to "unique" threats posed by Huawei and ZTE does not address why a company-based approach might mitigate global supply chain risks, and the FCC does not direct us to any place in the record where it addressed these comments. That flaw is not fatal, however. Huawei fails to show that the agency's consideration of these comments would have impacted adoption of a company-based prohibition. While the comments speak to the difficulty of improving American supply chain security through a company-based rule—or any other prohibition— given the global nature of the supply chain, they do not show that an equipment-based rule would be more effective. Thus, even if the agency failed to respond to these comments, it was not required to do so because they were "incapable of affecting" the rule the agency ultimately adopted. *City of Portland*, 507 F.3d at 715.

Finally, Huawei argues the FCC failed to consider comments that a company-based approach would improve network security less effectively than a narrower approach, such as prohibiting switching equipment.[66] The

---

genuine free-market competition and hurts innovation by driving legitimate competitors out of business on the strength of its unfair advantages." *Id.* at 65 n.209 (citation omitted).

[66] From these comments, Huawei argues that "excluding *all* equipment of covered companies . . . does not improve network security." That overstates the matter. The cited

FCC responds that it did consider such arguments and concluded a company-based approach would be "safer and more administrable." Huawei counters that the FCC's only safety-related justification for a broader rule was that malicious actors can build malware and vulnerabilities "directly into communications equipment," even non-"flagship equipment." *USF Order*, 34 FCC Rcd. at 11450. Yet, the agency failed to address the argument advanced in comments that the rule could, as Huawei puts it, prohibit "*all* dangerous equipment ('flagship' or otherwise), regardless of supplier, without banning safe products." The FCC has the better argument, if just barely. The Commission did consider comments warning that prohibiting "*every* product from a covered company" would not serve any "material security purpose." *Id.* at 11449. The FCC also considered exempting products "that cannot route or redirect user data traffic, or which do not provide visibility into user data." *Id.* at 11450 n.209. Nonetheless, the agency found that the need to guard against the risk associated with *any* equipment provided by a covered company outweighed the costs of a broad rule, and it underscored the importance of preventing "bad actors [from] circumvent[ing its] prohibitions through clever engineering." *Id.* at 11450 & n.209. It also concluded that "a blanket prohibition" would promote ease of administration and compliance, a justification amply supported in the record and one that would apply regardless of an equipment-based approach's relative security virtues. *Id.* at 11449–50.[67] Thus, we conclude the FCC did not fail to offer a "reasonable and reasonably explained" analysis of the

comments argue only that excluding all equipment will cover equipment that is inherently secure, not that a broad prohibition will fail to reduce security threats.

[67] For example, the FCC cited comments from Vermont Telephone arguing the proposed rule "would eliminate uncertainty and reduce regulatory burdens that fall most heavily on small operators." *USF Order*, 34 FCC Rcd. at 11450.

relative virtues of a company-based, rather than equipment-based rule, which is all the APA requires. *Prometheus Radio Project*, 141 S. Ct. at 1160.

Similarly, we do not find the agency failed to consider any properly-raised legal arguments that Huawei identifies. To the contrary, the Commission discussed—and rejected—arguments that the FCC lacks authority and expertise to make national security judgments, *USF Order*, 34 FCC Rcd. at 11435–36, as well as arguments that U.S.-based subsidiaries of Chinese companies are immune from Chinese government control, *id.* at 11442–43 & nn. 146–47. True, the FCC did not respond to Huawei's contention that delegating designation authority to the Bureau violates the Appointments Clause of the U.S. Constitution, art. II, § 2, cl. 2. But Huawei does not dispute the FCC's assertion that the company made this argument in "a single sentence, buried in a list of 'additional reasons'" in a submission focused on the Commission's citation of CALEA. And the FCC correctly points out that it "need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner." *New England Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69, 79 (D.C. Cir. 2003) (citation omitted) (cleaned up).

Thus, we cannot say the FCC acted arbitrarily and capriciously by failing to consider any relevant and significant comment.

### 2. Cost-Benefit Analysis

Next, we consider Huawei's contention that the FCC's cost-benefit analysis "ignored important aspects of the problem and is irrational."

An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can "render the rule unreasonable" if the analysis rests on a "serious flaw." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). But courts afford agencies considerable discretion in conducting "the complex . . . economic analysis typical in the regulation

promulgation process." *Ibid.* (quoting *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002)); *see also Charter Commc'ns, Inc. v. FCC*, 460 F.3d 31, 42 (D.C. Cir. 2006) ("[C]ost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency[.]" (citation omitted)). "[C]ourts of review should be mindful of the many problems inherent in [considering costs] and uphold a reasonable effort made by the Agency." *Nat'l Wildlife Fed'n*, 286 F.2d at 563 (quoting *FMC Corp. v. Train*, 539 F.2d 973, 979 (4th Cir. 1976)). Indeed, our job "is not to undertake our own economic study, but to determine whether the [agency] 'has established in the record a reasonable basis for its decision.'" *Chem. Mfrs. Ass'n*, 870 F.2d at 251 (quoting *Kennecott v. EPA*, 780 F.2d 445, 456 (4th Cir. 1985)).

Huawei argues the agency unreasonably calculated the rule's costs "on the unstated assumption that the rule applies to Huawei and ZTE alone" and also ignored evidence about the costs of excluding Huawei from the USF program.[68] Additionally, Huawei asserts the agency illogically estimated the rule's benefits by calculating the level of benefits necessary to offset the rule's $960 million cost and then assuming benefits at that level without substantiation. We disagree that the FCC's cost-benefit analysis reflects unreasoned decisionmaking.

First, as the FCC argues, it was reasonable to calculate the rule's cost based on Huawei and ZTE alone: Those were the only companies initially designated, and the Commission lacked an evidentiary basis to calculate the

---

[68] Specifically, Huawei argues the FCC ignored evidence that: Huawei exerts competitive pressure on prices; replacing or adapting Huawei equipment would result in long-term interoperability problems; Huawei's exclusion would cause some carriers to go out of business or raise prices; Huawei's exclusion would result in reduced access to and quality of services in areas where Huawei is the only provider; and Huawei's exclusion would exacerbate the problem of delayed 5G deployment in rural communities.

rule's costs based on other companies. *See Prometheus Radio Project*, 141 S. Ct. at 1160 (noting the "APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies"). Huawei counters that it submitted "detailed evidence about similarly situated companies" and "extensive economic analysis" the Commission failed to consider. But Huawei does not point us to record evidence about the costs of excluding similarly situated companies from the USF program, which was the relevant data for the FCC's analysis. Rather, the FCC reasonably relied on "the evidence it had"—extensive data about the costs of excluding Huawei and ZTE from the market. *See USF Order*, 34 FCC Rcd. at 11467 (noting seven carriers provided cost data on replacing Huawei or ZTE equipment);[69] *see also Prometheus Radio Project*, 141 S. Ct. at 1159 (rejecting argument that FCC's judgment was arbitrary and capricious because it acted on the imperfect data it had).

Second, while it is true that the FCC did not consider certain costs identified by commenters,[70] Huawei does not identify relevant cost *data* the

---

[69] Each of these carriers reported that Huawei or ZTE equipment made up a significant percentage of their networks and estimated the cost of replacing that equipment.

[70] The Commission's cost-benefit analysis did not mention arguments about three of the five costs Huawei identifies: (1) the effect of Huawei's market presence on equipment costs, (2) the likelihood that some carriers could not comply with the rule *and* stay in business, and (3) the absence of comparable providers in rural areas and thus the probability of reduced access. But as discussed, it considered the second and third costs elsewhere in the Order. 34 FCC Rcd. at 11434, 11453. Additionally, the Commission considered and discounted the fifth cost identified by Huawei, delays in 5G deployment in rural communities. *See USF Order*, 34 FCC Rcd. at 11470 (noting the "four largest U.S. mobile carriers do not use and [do not plan] to use Huawei (or ZTE) radio access network equipment"). It also considered "interoperability" costs or "capital outlays" beyond replacement costs, such as associated "service and maintenance" costs, incorporating them into its cost stream estimate. *Id.* at 11466, 11467 nn.308–09, 11468. Huawei does not argue the FCC's capital cost estimate was unreasonable but rather argues that it failed to consider these costs altogether, which is incorrect.

agency ignored. For example, a representative comment identified by Huawei recognized Huawei has "little presence in the U.S. today" but asserted without evidence that a "small sales share does not by itself indicate a firm lacks competitive significance." Another estimated the competitive effect *if* Huawei were permitted to enter the market, not its current effect in reducing prices. A third speculated that "[customer] fees might have to be raised" and that it would "be a struggle to [stay] afloat." The FCC was not required to "conduct or commission [its] own empirical or statistical studies" to confirm or reject the speculative costs identified by comments such as these. *See Prometheus Radio Project*, 141 S. Ct. at 1160; *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (an agency "need not respond at all to comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest'" (citation omitted)). Indeed, as noted, the agency stated elsewhere that "[n]o provider ha[d] yet offered the detailed financial records . . . necessary . . . to determine whether an individual provider actually could not maintain its existing network" and comply with the rule. *USF Order*, 34 FCC Rcd. at 11453.

Rather, as the agency suggests, it reasonably focused on the most significant cost suggested by the record—"the cost of replacing Huawei and ZTE equipment," *USF Order*, 34 FCC Rcd. at 11466—and it reasonably explained its methodology.[71] For example, in calculating the replacement cost, the FCC explained that it considered estimates from the seven carriers that had reported their replacement costs and based its analysis on the

---

[71] *See Charter Commc'ns, Inc.*, 460 F.3d at 41–42 (finding FCC adequately explained "why the costs of [an] integration ban were justified" where agency generally discussed its agreement with some commenters' initial cost estimates and agreement with others' long-term estimates); *cf. State Farm*, 463 U.S. at 52–53 (agency failed to justify rescission of passive seat belt rule where "no direct evidence" showed that passive seatbelts would not substantially increase usage).

median estimate, discounted by ten to twenty percent, because carriers with "above average costs" were likely to have the strongest incentives to comment and because the reporting carriers represented "only 0.15% of mobile carrier end-user revenues." *Id.* at 11467 & n.308. Huawei does not object to specific cost calculations such as these but to the agency's failure to consider additional, difficult-to-measure costs about which the FCC lacked hard data, such as "the broader economic costs of depriving Americans of access to Huawei's market-leading technology." The agency's decision to base its analysis instead on the replacement cost estimates before it does not render its analysis unreasonable.

Similarly, Huawei does not show the FCC's calculation of benefits renders its analysis unreasonable. Huawei argues the agency provided no hard evidence that the rule's claimed benefits would accrue. That is true. As the FCC admits in its brief, it merely "opined that the benefits of the rule included avoiding network disruption and surveillance, as well as possible data breaches" and that these benefits were "difficult to quantify" but "likely to be substantial" based on the digital economy's size and the current estimated cost of such disruption. *See USF Order*, 34 FCC Rcd. at 11465–66, 11481; *supra* note 16. The agency also explained that the rule would result in additional benefits even harder to quantify, such as preventing detrimental impacts to national defense, public safety, homeland security, military readiness, and critical infrastructure, as well as the resulting loss of life that could occur if national communications networks were disrupted. *Id.* at 11466.

But the FCC was not required to support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits. For example, the D.C. Circuit rejected a similar challenge to a cost-benefit analysis where the FCC identified "benefits likely to flow from a more competitive and open supply market," including "potential savings to

consumers from greater choice among navigation devices," the "spurring of technological innovations," and Congress's view of the commercial availability of navigation devices "as a benefit in and of itself." *Charter Commc'ns, Inc.*, 460 F.3d at 42. Moreover, the Third Circuit opinion upon which Huawei principally relies was recently reversed by the Supreme Court in a decision underlining the deferential nature of our review in this context. *See Prometheus Radio Project v. FCC*, 939 F.3d 567 (3d Cir. 2019), *rev'd*, 141 S. Ct. at 1161. Accordingly, we are limited to considering whether "the FCC made a reasonable predictive judgment based on the evidence it had," and we cannot demand the agency perform its own "empirical or statistical studies," especially when it relies on unquantifiable benefits. *Prometheus Radio Project*, 141 S. Ct. at 1160.[72]

In sum, the FCC did not act unreasonably by concluding that hard-to-quantify benefits, such as protecting national defense and public safety and preventing potential loss of life, would exceed the rule's costs, which it reasonably calculated based on the record evidence. Nor did the FCC unreasonably estimate that excluding insecure equipment or services from even a portion of the nation's communications networks would reduce the likelihood of a significant disruption to the digital economy and counter the frequency of malicious cyberactivity.

### 3. Rejection of Risk-Based Approach

Finally, we turn to Huawei's contention that the FCC acted arbitrarily and capriciously by rejecting an alternate approach that would have "served

---

[72] *See also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (distinguishing *State Farm* as "set[ting] aside agency action . . . because of failure to adduce empirical data that can readily be obtained," as opposed to "propositions for which scant empirical evidence can be marshaled," such as "the harmful effect of broadcast profanity on children," and refusing to "insist upon obtaining the unobtainable").

its putative national security objective more effectively and at lower cost." In Huawei's view, the agency failed to consider its own expert advisors' recommendations to adopt a risk-based approach,[73] rather than a company-based approach, and failed to explain its ultimate decision to focus on companies instead. The agency counters that it did explain that a company-based approach was the "only reliable protection against potential incursions" because equipment beyond the "company's flagship equipment" might contain vulnerabilities. Additionally, a company-based prohibition would provide "regulatory certainty" and greater ease of implementation and enforcement, reducing compliance costs. But, counters Huawei, the agency failed to show that it even considered a risk-based approach, and regardless, the possibility that flagship equipment might contain vulnerabilities does not support barring safe equipment. The agency has the better argument.

First, the FCC did explain why it rejected a risk-based approach. Responding to a comment advocating for a "testing program that would allow impacted carriers to submit for government approval their proposed, but mission-critical, service or maintenance plans," *i.e.*, a risk-based approach, the FCC stated that "such a framework would do little to address the potential for foreign adversaries to intentionally and maliciously access or exploit equipment within our communications networks." *USF Order*, 34 FCC Rcd. at 11449 n.204. In other words, the FCC found, as one commenter argued, that a risk-based approach like "product testing" less effectively addressed the "the risk of *deliberately compromised* products—those that have

---

[73] Huawei uses "risk-based" to refer to an approach that would "focus[] on design principles and processes." Huawei cites comments suggesting such an approach might include permitting voluntary compliance with the NIST Cybersecurity Framework or "an equipment testing regime."

been intentionally altered by a state-sponsored actor to enable future exploitation—rather than those products that are merely *vulnerable* to a future attack due to inherent weaknesses in design or implementation." Telecomms. Indus. Ass'n, Comments on Protecting Against National Security Threats to the Communications Supply Chain Through FCC Programs, 36 (June 1, 2018).

Second, as discussed, the FCC offered a reasoned explanation for adopting a company-based approach. *USF Order*, 34 FCC Rcd. at 11449, 11450 n.209, 11453. Even accepting Huawei's premise that a risk-based approach would have more effectively achieved the FCC's security objective, we must defer to the agency's reasoned explanation, supported by comments in the record, that a company-based prohibition would be "easier for providers to implement and for the Commission to enforce" and "thus more cost effective" than alternative approaches. *Id.* at 11449 & n.204, 11450.[74] The agency explained that a blanket prohibition would avoid the time-consuming and costly administrative burden of making determinations "on a product-by-product basis." *Id.* at 1150. It would also reduce providers' compliance burden by allowing them to certify their subsidiaries and affiliates had not used a covered company's equipment, rather than certifying compliance "on a product-by-product or even component-by-component basis." *Ibid.* By the same token, a company-based certification would simplify and make less costly USAC's auditing responsibilities. *Ibid.*

Finally, the agency acknowledged that its rule would not "completely address the risks posed by equipment or services produced or provided by covered companies" and reasonably concluded that its "targeted rule"

---

[74] *See USF Order*, 34 FCC Rcd. at 11450 ("We agree with Vermont Telephone . . . that our rule 'would eliminate uncertainty and reduce regulatory burdens that fall most heavily on small operators[.]'" (citation omitted)).

would be part of "ongoing and incremental" efforts to secure the supply chain and national communications networks. *Id.* at 11453. Such efforts could very well include a risk-based approach in future.

"Nothing prohibits federal agencies from moving in an incremental manner." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009). And Huawei does not suggest the agency unreasonably found that a broad prohibition would cover insecure equipment, just that it covered more equipment than necessary. Nor does it argue the FCC unreasonably gave significant weight to the compliance and administrative burden associated with an alternative approach. "Mindful" that we cannot "substitute [our] judgment for that of the agency," we do not find the agency's action outside the realm of reasonableness. *See Sierra Club*, 939 F.3d at 664 (quoting *10 Ring Precision*, 722 F.3d at 723).

## C. Vagueness

We next consider Huawei's claim that the USF Rule violates the APA because it is vague and standardless.[75] As discussed, the rule directs designation of companies "pos[ing] a national security threat to the integrity of communications networks or the communications supply chain." 47 C.F.R. § 54.9; *USF Order*, 34 FCC Rcd. at 11438. Huawei argues the rule does not give "meaningful guidance" to affected companies, for instance by

---

[75] The title of the relevant section of Huawei's opening brief states the USF Rule also "violates . . . due process," but the brief itself does not develop this point as a distinct argument. Instead, it states in passing that the APA's arbitrary-and-capricious standard "comports with the Due Process Clause, which likewise requires regulations to 'give fair notice' . . . and to establish intelligible standards." Further, this section relies entirely on APA cases in applying vagueness principles to the rule, and Huawei's reply brief exclusively discusses APA arguments. Accordingly, we do not address whether the USF Rule is also vague and standardless in violation of the Fifth Amendment. *See Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument." (citation omitted)).

failing to define key terms such as "national security threat," "integrity," and "communications supply chain." It also claims the rule provides no "metric" for assessing whether a designation reflects reasoned decisionmaking, instead relying on the "totality of evidence." *See USF Order*, 34 FCC Rcd. at 11439. For this argument, Huawei cites a line of D.C. Circuit decisions, beginning with *Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999), which, according to Huawei, teach that agency action is arbitrary and capricious "if it does not articulate a comprehensible standard." *See also ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018); *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75 (D.C. Cir. 2006).

These cases do not support Huawei's claim. The D.C. Circuit has rejected the argument that "*Pearson* stands for the proposition that an unarticulated standard does not comport with . . . the APA." *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) (cleaned up). To the contrary, *Pearson* holds only that "an agency proceeding on a case-by-case basis must pour 'some definitional content' into a vague statutory term by 'defining the criteria it is applying.'" *Ibid.* (quoting *Pearson*, 164 F.3d at 660). And a closer examination of this line of cases reveals they are far afield from Huawei's challenge to the USF Rule.

Begin with *Pearson* itself. Marketers of diet supplements challenged the FDA's ruling that health claims on their labels were not supported by "significant scientific agreement." 164 F.3d at 652 (quoting 21 C.F.R. § 101.14(c)). The court sustained the challenge because the agency "never explained" why the claims failed to meet the standard. *Id.* at 654. But the court did not imply that the standard itself was invalid. To the contrary, it rejected the notion that "the agency was necessarily required to define the term in its initial general regulation" or that it was "obliged to issue a comprehensive definition all at once." *Id.* at 661. Instead, the agency could

give "definitional content" to the standard on a "case by case" basis. *Id.* at 660, 661; *see also id.* at 660 n.12 (suggesting APA could be satisfied if agency "provide[s] guidance in implementation" of the general standard).

Next, *Tripoli Rocketry*. Rocket enthusiasts challenged the ATFE's designating a specific fuel as an "explosive" because it "deflagrates." 437 F.3d at 77–78, 79 (citing 18 U.S.C. § 841(d)). The court remanded for reconsideration because the agency "never reveal[ed] how it determines that a material deflagrates." *Id.* at 81. The agency merely stated that deflagration was "much faster" than burning, thus "articulat[ing] no reasoned basis for its decision." *Id.* at 81, 83. But, again, the court did not suggest the "deflagration" standard was itself invalid. Rather, it faulted the agency for failing to "offer a coherent explanation" for "designat[ing] a *particular material*" as deflagrating. *Id.* at 84; *see also id.* at 77 ("The problem . . . is that ATFE's explanation for its determination that APCP deflagrates lacks any coherence.").

Finally, *ACA International*. Petitioners challenged the FCC's ruling clarifying the scope of an "automatic telephone dialing system" for purposes of the federal ban on unwanted robocalls. 885 F.3d at 693–94 (citing 47 U.S.C. § 227(b)(1)(A)(iii); 30 FCC Rcd. 7961 (2015)).[76] The court set the ruling aside as unreasonable because it swept in all "smartphones," thus giving the federal ban an "eye-popping sweep" Congress never contemplated. *Id.* at 697. Moreover, interpreting the ruling *not* to include smartphones would make its standard "[in]comprehensible": the ban would then have embraced internet browsers but not smartphones, based on "[p]recisely the same logic." *Id.* at 700. Thus, the court invalidated the

[76] *See* Declaratory Ruling and Order in the Matter of Rules and Reguls. Implementing the TCPA, FCC 15-72, CG Docket No. 02-278, WC Docket No. 07-135, 30 FCC Rcd. 7961 (released July 10, 2015).

agency ruling as either grossly overbroad (by sweeping in all smartphones) or incoherent (by arbitrarily excluding smartphones but not browsers).

Huawei's attack on the USF Rule is quite different from the challenges to agency action in those cases. Huawei does not here challenge the agency's *application* of a broad standard to a specific case. Rather, as its reply brief makes perfectly clear, Huawei challenges the putative vagueness of the USF Rule "on its face."[77] But that facial attack finds no support in the cases Huawei relies on. As discussed, those cases involve an agency's failure to explain how a broad standard applied to a particular case (*Pearson* and *Tripoli Rocketry*) or an agency's ruling that rendered a statutory term incoherent (*ACA International*). Indeed, those cases support *rejecting* Huawei's claim. An agency is "not '. . . obliged to issue a comprehensive definition all at once.'" *PDK Lab'ys*, 438 F.3d at 1194 (quoting *Pearson*, 164 F.3d at 661). Instead, it may "'proceed case by case'"—as the FCC seeks to do through the initial designation process—"in fleshing out the contours of vague statutory terms." *Ibid.* (quoting *Pearson*, 164 F.3d at 661).[78] Based on that standard, the USF Rule falls well within the permissible bounds of agency decisionmaking.

True, as Huawei suggests, the FCC's application of its "totality of the circumstances" test could become "a cloak for agency whim," but an

---

[77] To the extent that Huawei purports to challenge the FCC's application of the rule in the initial designation, we have already explained that its challenge is unripe. *See supra* pp. 15–17. But nothing we say here precludes Huawei from bringing a similar claim in the context of its challenge to the *final* designation, which has been held in abeyance pending our decision in this case. *See supra* p. 12.

[78] *See also Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 359 (D.C. Cir. 2003) (upholding FERC's "case-by-case approach to determining whether a reservoir is 'necessary or appropriate'" where it "adequately explained its application of that approach to the facts of this case").

agency's adopting such a standard is not "necessarily arbitrary and capricious." *PDK Lab'ys*, 438 F.3d at 1194 (citation omitted). Rather, the relevant question for examining the rationality of the "national security threat" standard is whether the agency adequately explained why it adopted it. *See Prometheus Radio Project*, 141 S. Ct. at 1158. We have already exhaustively examined that question and concluded that the FCC did so. *See supra* pp. 41–54.

Accordingly, we reject Huawei's claim that the rule facially violates the APA because it is vague and standardless.

## D. Due Process

Finally, we turn to Huawei's contention that the rule must be vacated because the initial designation process (1) "rests on an error of law," namely the assumption the agency could initially designate companies without process, and (2) fails to provide such procedures consistent with the Constitution. Both arguments fail.

Agency action shall be set aside if it is unlawful, 5 U.S.C. § 706, "which of course includes unconstitutional action," *Fox Television Stations*, 556 U.S. at 516; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[A]n order may not stand if the agency has misconceived the law."). Huawei argues the rule should be vacated because "the FCC failed to recognize that 'initial designation' implicates constitutionally protected interests" and, thus, erred legally in determining it need not provide due process of law prior to initially designating a company. *See* U.S. CONST. amend. V.; *Mathews v. Eldridge*, 424 U.S. 319, 332–35 (1976). Similarly, Huawei contends the rule "requires vacatur on constitutional grounds" because the FCC "must provide adequate pre-deprivation procedural protections." The FCC responds that Huawei's due process challenge to the initial designation "makes little sense, because the initial designation is *how* the agency provides

process." Huawei counters that the Commission did not "contest [on appeal] that the USF rule fails to provide pre-deprivation due process," so the "rule must be vacated for that reason alone."

Huawei's arguments rest on the erroneous premise that the initial designation is itself a deprivation. Yet, the sole potential deprivation to *initially* designated companies is a *reputational* injury. And "[a]llegations of damages to one's reputation" by a state actor's statements generally "fail to state a claim of denial of a constitutional right," unless they are "accompanied by an infringement of some other interest." *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). Huawei argues that an initial designation "tangibly alters both designated companies' ability to compete and their protected goodwill." But Huawei does not contend the initial designation seeks to put designated companies out of business in the same way the state actors attempted to do in *Thompson*, where we recognized "a liberty interest in operating a legitimate business." 70 F.3d at 392; *see also Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983) (finding liberty interest in ability to pursue specific occupation). Nor can Huawei rely on our precedent in *Marrero v. City of Hialeah*, applying state law, for the proposition that business goodwill represents a "tangible" interest under federal law. *See* 625 F.2d 499, 514–15 (5th Cir. 1980) (finding Florida could not deprive plaintiffs of business goodwill without due process of law because "that interest [was] a protected property interest under Florida law"). Thus, even if Huawei could establish that an initial designation stigmatizes designated entities, it fails to show that it deprives the company of "some other interest" requiring due process protection. *See Texas*, 70 F.3d at 392.

Moreover, as the FCC argues, the rule affords pre-deprivation due process *through* the initial designation procedures, which provide "notice of evidence in the record and the Commission's consideration of that evidence" and "invite[ a company] to be heard on its sufficiency or any

countervailing evidence." Only after receiving this process does an entity face agency action with legal effect, *i.e.*, a final designation. 47 C.F.R. § 54.9(b)(2); *see supra* p. 16. As the agency rightly contends, "[b]y Huawei's logic," if the FCC had provided pre-initial-designation process, "Huawei would have been entitled to object that *that* notice should have been preceded by an even earlier round of notice and a hearing." That is not what due process requires. *See Goldberg v. Kelly*, 397 U.S. 254, 267 n.14 (1970) ("Due process does not, of course, require two hearings."); *see also Riggins v. Goodman*, 572 F.3d 1101, 1110 (10th Cir. 2009) ("[D]ue process is required not before the initial decision or recommendation to terminate is made, but instead before the termination actually occurs."); *Crum v. Vincent*, 493 F.3d 988, 993 (8th Cir. 2007) (finding one "meaningful opportunity to be heard" satisfies due process).

In short, Huawei fails to demonstrate the initial designation would stigmatize an initially designated company's reputation in connection with a "'more tangible' interest," as our precedents require to show a constitutionally protected reputational interest in pre-deprivation process. *Marrero*, 625 F.2d at 513; *see also Orton Motor, Inc. v. HHS*, 884 F.3d 1205, 1215 (D.C. Cir. 2018) (rejecting petitioner's argument that "mere issuance of a warning letter, absent further enforcement action," where injury was to "reputation alone," required due process).[79] Accordingly, we do not find the

---

[79] Huawei's best authority for finding a tangible injury is an out-of-circuit case holding an airline had a "constitutionally cognizable interest in avoiding the loss of government contracting opportunities based on stigmatizing charges." *Reeve Aleutian Airways, Inc. v. U.S.*, 982 F.2d 594, 598 (D.C. Cir. 1993). But that case is distinguishable. The agency action challenged there was Reeve's actual "suspen[sion] . . . from participation in all military airlifts," *id.* at 597, which would be analogous to Huawei's *final* designation. But Reeve did not claim it was entitled to pre-deprivation process before the notice that the company *might* be suspended, *id.* at 596, which would be analogous to

No. 19-60896

rule must be vacated, either because it rests on a mistaken view of the law or because it fails to provide constitutionally required due process.

## Conclusion

The petition for review is DENIED.

---

Huawei's initial designation. *Reeve*, therefore, does not stand for the proposition that Huawei was somehow entitled to process before the *initial* designation occurred.